In re NAL FINANCIAL GROUP, INC., Nal Acceptance Corp., Performance Cars of South Florida, Inc., Autorics, Inc., Nal Insurance Services, Inc., Special Finance, Inc., Nal Mortgage Corporation, Debtors.

Bankruptcy Nos. 98–21966–BKC–PGH to 98–21972–BKC–PGH.

United States Bankruptcy Court, S.D. Florida, Fort Lauderdale Division.

Aug. 2, 1999.

Mindy Mora, Stroock & Stroock & Lavan, LLP, Miami, FL.

Paul J. Battista, Genovese, Lichtman, Joblove & Battista, Miami, FL.

James E. Shepherd, Pohl & Short, P.A., Winter Park, FL.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUMMARY JUDGMENT AGAINST INTERBANC MORTGAGE SERVICES, INC.

PAUL G. HYMAN, Jr., Bankruptcy Judge.

**THIS MATTER** came before the Court on March 9, 1999, upon the Official Committee of Unsecured Creditors' (the "Committee") *Motion for Summary Judgment Against Interbanc Mortgage Services, Inc.* (the "Motion for Summary Judgment"). On March 23, 1999, Interbanc Mortgage Services, Inc. ("Interbanc") filed a *Response to the Committee's Motion for Summary Judgment* (the "Response"). On March 25, 1999, Interbanc filed the *Affidavit of Paul Henderson in Opposition to Motion for Summary Judgment filed by Committee Against Interbanc Mortgage Services* ("Henderson's Affidavit"). Subsequently, on April 5, 1999, the Committee filed a *Reply Memorandum of Law in Support of its Motion for Summary Judgment Against Interbanc Mortgage Services, Inc.* (the "Reply"). The parties filed a Joint Stipulation of Facts on April 9, 1999. Then, on April 26, 1999, Interbanc filed a *Response to the Committee's Reply Memorandum of Law in Support of its Motion for Summary Judgment* (the "Response to the Reply"). Having reviewed the Motion for Summary Judgment, the Response, Henderson's Affidavit, the Reply, the Joint Stipulation of Facts, and the Response to the Reply, the Court finds that there are no genuine issues of material fact. Therefore, summary judgment is appropriate. *See Clemons v. Dougherty County,* 684 F.2d 1365, 1368 (11th Cir.1982) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The Court, being fully advised in the premises, hereby enters the following Findings of Fact, Conclusions of Law, and Order.

### FINDINGS OF FACT

On or about December 27, 1995, Interbanc paid $200,000 to NAL Financial Group, Inc. ("NALF") and NALF issued to Interbanc two (2) "Units." The rights and obligations of NALF and Interbanc with respect to this transaction are set forth in four (4) documents: the Securities Purchase Agreement, the Registration Rights Agreement, the 9% Subordinated Convertible Debenture, and the Warrant to Purchase Common Stock of NAL Financial Group Inc. Pursuant to the Securities Purchase Agreement, a "Unit" consisted of a $100,000 Principal Amount, a 9% Subordinated Convertible Debenture issued by NALF (the "Debentures"), and 4,500 Common Stock Purchase Warrants with an exercise price of $15.00 per share with respect to the common stock of NALF. The Debentures, according to the Securities Purchase Agreement, were convertible into restricted shares of NALF's common stock (the "Restricted Stock"). NALF did not include the Debentures or Restricted Stock in any registration statements it filed with the Securities and Exchange Commission ("SEC") during 1996. On or about June 24, 1997, Interbanc converted its Debentures into Restricted Stock and subsequently sold that Restricted Stock.

In 1997, Interbanc filed suit (Case # C197–7876) in the Circuit Court in and

for Orange County, Florida (the "Circuit Court Case"), against NALF alleging that Interbanc was damaged when NALF failed to register the Debentures for two stock offerings subsequent to the execution of the Securities Purchase Agreement. The Securities Purchase Agreement and the Registration Rights Agreement required that NALF use its best efforts to register the Debentures on or before May 15, 1996. The Complaint filed in the Circuit Court Case is comprised of three counts: (1) Fraudulent Inducement, (2) Breach of Fiduciary Duty, and (3) Breach of Contract. On February 12, 1998, the Orange County Circuit Court entered an Order on NALF's and Robert R. Bartolini's ("Bartolini") motion to dismiss complaint. In this Order, Interbanc's claims for fraudulent inducement and breach of fiduciary duty were dismissed without prejudice, the motion to dismiss complaint was denied as to Interbanc's claim for breach of contract, Interbanc was given twenty days to file amended counts for fraudulent inducement and breach of fiduciary duty, and NALF and Bartolini were directed to file an answer within twenty (20) days.

On March 23, 1998, NALF filed for reorganization under Chapter 11 of the Bankruptcy Code. On August 7, 1998, Interbanc filed its Proof of Claim for an unsecured non-priority claim in the amount of $232,-148.70[1] against NALF ("Claim Number 102"). Interbanc listed the Circuit Court Case as the basis for this claim. On July 20, 1998, NALF filed *Debtor's Plan of Reorganization* (the "Plan") and the *Disclosure Statement for Debtor's Plan of Reorganization* (the "Disclosure Statement"). October 5, 1998, the Court entered an Order confirming the Plan (the "Confirmation Order"). In the Confirmation Order, the Committee was authorized to object to

proofs of claims filed by NALF's creditors. Accordingly, the Committee filed two objections to Claim Number 102, the latter of which asserts that pursuant to 11 U.S.C. § 510(b) Claim Number 102 should be subordinated in payment to the claims of all unsecured creditors and have the same priority as a Class 9 interest (equity security holders) under NALF's Plan. Interbanc filed two responses, the first to the Committee's original objection and the second to the Committee's amended objection. Interbanc's second response states that the claim is for breach of an agreement between Interbanc and NALF dated December 6, 1996, and that NALF breached that agreement by failing to register Interbanc's Restricted Stock.

On March 9, 1999, the Committee filed the instant Motion for Summary Judgment on its objection to Claim Number 102. Consistent with its second objection to that claim, the Committee asserts in the Motion for Summary Judgment that because the claim is for damages arising out of the sale of securities, it must be subordinated to the claims of general unsecured creditors and have the same priority as a Class 9 interest (equity security holders) under NALF's plan of reorganization pursuant to 11 U.S.C. § 510(b). In the Response filed on March 23, 1999, Interbanc argues that Claim Number 102 should not be subordinated to the claims of general unsecured creditors because the claim arose from the obligations set forth in the Debentures and NALF's breach of those obligations. Interbanc asserts that because NALF failed to register the Restricted Stock with the SEC soon after Interbanc exercised its option to convert the Debentures to Restricted Stock, Interbanc incurred damages by not being able to sell that stock for a significant profit. Once the Restricted Stock was registered, Interbanc, pursuant

---

1.

| | | |
|---|---|---|
| | Stock Value on 6/6/96 (19,000 shares @ $15.50 /share) | $294,500.00 |
| PLUS | Interest thereon @ 10% through 9/10/97 | $ 34,358.00 |
| LESS | Sale price of stock | $125,363.00 |
| PLUS | Additional accrued interest from 9/10/97 to 8/98 ($1,695.79/month) | $ 18,653.70 |
| PLUS | Attorney's fees | $ 10,000.00 |
| TOTAL | | $232,148.70 |

to NALF's CEO's advice, sold it for a loss in order to mitigate its damages. Interbanc notes that NALF never regarded Interbanc as an equity security holder; NALF treated the Debentures as debt instruments in the Plan.[2] For this reason, Interbanc requests that it be given the same priority as every other general unsecured creditor of NALF.

In Henderson's Affidavit filed on March 25, 1999, he asserts that the original transaction between Interbanc and NALF was a loan and not the purchase of equity in NALF and that the Debentures were evidenced as debt on NALF's books. Henderson further asserts that Interbanc's claim for damages arose from NALF's failure to register the Restricted Stock with the SEC and not from the purchase of any securities. Henderson insists that Interbanc is entitled to the return of the $200,000.00 it loaned to NALF plus interest at the rate of 9% per annum and damages arising out of NALF's breach of the terms of the Debentures in the amount of $203,495.00 plus accrued interest.

In the Reply filed on April 5, 1999, the Committee cites to the Securities Purchase Agreement to illustrate that the transaction between NALF and Interbanc was an investment and not an ordinary loan. Because the Debentures are repeatedly referred to as securities and the risks of investing are clearly disclosed, the Committee argues that Interbanc became an equity security holder when it entered into the Securities Purchase Agreement with NALF. Even if the Court finds that Interbanc was not an equity security holder at that point, the Committee asserts that when Interbanc exercised its option to convert the Debentures into Restricted Stock, Interbanc became an equity security holder. The Committee notes that Interbanc

did not *loan* money to NALF with the expectation that it would recover the principal plus interest; rather, Interbanc *invested* money in NALF expecting its investment to significantly increase in value. The Committee also points out that Interbanc did not assert a claim for the return of the $200,000.00 it loaned NALF plus interest while it held the Debentures. Interbanc converted those Debentures and sold the Restricted Stock before asserting such a claim. Furthermore, Interbanc's damages claim for breach of the Debentures was not made until after Interbanc converted the Debentures to Restricted Stock. This damages claim, according to the Committee, should have been made "while [Interbanc] still owned the debentures, i.e., before it voluntarily converted the debentures into stock."[3] Finally, the Committee argues that Interbanc's claim that NALF breached its obligation to register the Restricted Stock in a timely fashion is a claim that "directly concerns a stock transaction, and is not merely a claim on a debt." "Because Interbanc has alleged a defect in the sale of a security, namely the timing of its ability to sell the common stock it received upon conversion of its [,]" Interbanc concludes that Claim Number 102 is a "claim for damages arising from the purchase or sale of ... security," and so should be subordinated to the claims of NALF's general unsecured creditors pursuant to 11 U.S.C. § 510(b).

In the Response to the Reply filed on April 26, 1999, Interbanc asserts that its damages claim arose while it was holding the Debentures and not while Interbanc was an equity security holder. NALF failed to register Interbanc's shares in May of 1996, more than a year before Interbanc converted the Debentures to Restricted Stock. As a result of this al-

---

2. After reviewing the Plan and the Disclosure Statement, the Court finds nothing to substantiate this allegation.

3. "Whether or not a claim and debt exist does not depend on whether a creditor chooses to

pursue its claim." *In re Energy Coop., Inc.,* 832 F.2d 997, 1002 (7th Cir.1987). *See also In re Clinton Centrifuge, Inc.,* 81 B.R. 844, 849 (Bankr.E.D.Pa.1988)

leged breach of NALF's contractual obligation, Interbanc contends that it incurred damages while it still held the debt instrument. Interbanc reiterates that when it finally did convert the Debentures and sold the Restricted Stock, it did so to mitigate its damages. Interbanc asks that the Court not penalize Interbanc by subordinating Claim Number 102 to the claims of NALF's general unsecured creditors. Interbanc argues that had it not sold its Restricted Stock to mitigate damages, its claim in bankruptcy would have been $125,363.00 greater than it is now, NALF's burden would have been that much greater, and the other unsecured creditors would receive that much less. Finally, Interbanc argues that notwithstanding the fact that the Securities Purchase Agreement refers to the Debentures as securities, NALF treated the Debentures as debt instruments and not an equity investment. Moreover, NALF "treated the holders of debentures as creditors of the company that would ultimately have to be repaid, either in cash or, as in the case of Interbanc, by giving it company stock in repayment of the debt." Interbanc reasons that NALF must not have considered Interbanc an equity security holder when it executed the Securities Purchase Agreement because the Committee stated in the Reply that "when Interbanc converted its debentures to stock, it *became* an equity security holder in NALF." According to Interbanc, if Interbanc became an equity security holder at that point, it must not have been one before the conversion.

### CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

A motion for summary judgment is appropriate where there are no genuine issues of material fact. *See* Fed.R.Civ.P. 56 (as adopted by Fed.R.Bankr.P. 7056 and 9014). A court should enter summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.Rule Civ.P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *on remand to Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). *See also Nasser v. City of Homewood,* 671 F.2d 432 (11th Cir.1982); *McLaughlin v. City of LaGrange,* 662 F.2d 1385 (11th Cir.1981), *reh'g denied,* 668 F.2d 536 (11th Cir.1982), *cert. denied,* 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982).

In the instant case, Interbanc contends that "there are several issues of material fact relating to the nature of Interbanc's claim and issues of law relating to treatment of the claim under Section 510(b)." Although the Court agrees that there remain issues of *law* relating to the treatment of Interbanc's claim under § 510(b), the Court finds that there are no genuine issues of material *fact* that would preclude entry of summary judgment. *See Clemons v. Dougherty County,* 684 F.2d 1365, 1368 (11th Cir.1982) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

The issues of law before the Court are (1) whether the Debentures and Restricted Stock are security within the meaning of 11 U.S.C. § 510(b), and (2) whether Claim Number 102 is a "claim *arising from* rescission of a purchase or sale of a security of the debtor ... for damages *arising from* the purchase or sale of such a security[.]" 11 U.S.C. § 510(b) (emphasis add-

ed). If the Court finds that the Debentures and Restricted Stock are security and that Claim Number 102 is a claim within the meaning of 11 U.S.C. § 510(b), Claim, Number 102 "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock." 11 U.S.C. § 510(b).

■ With respect to the first issue before the Court, Interbanc argues that because the Debentures are not *security* as defined by the Bankruptcy Code, Claim Number 102 cannot possible arise from "the purchase or sale of ... a *security*" under 11 U.S.C. § 510(b). Interbanc reasons that because the causes of action underlying Claim Number 102 arose before Interbanc converted the Debentures to Restricted Stock, and thus before the Debentures became *security*, Claim Number 102 is not a claim under § 510(b). As such, Claim Number 102 should not be subordinated to the claims of NALF's general unsecured creditors pursuant to that provision of the Bankruptcy Code.

Section 101(49)(A) of the Bankruptcy Code states that security includes a "debenture" and an "investment contract or certificate of interest or participation in a profit-sharing agreement ... if such contract or interest is required to be the subject of a registration statement filed with the Securities Act of 1933[.]" 11 U.S.C. § 101(49)(A)(v) & (xii). The Securities Purchase Agreement, which effected Interbanc's purchase of the Debentures, repeatedly refers to the Debentures as an "investment" and as "securities." Based on § 101's definition and the language of the Securities Purchase Agreement,[4] the Court finds that even if Interbanc's causes of action arose before Interbanc converted the Debentures into Restricted Stock, those Debentures constituted security within the meaning of § 510(b) of the

Bankruptcy Code. Before concluding that Claim Number 102 is a claim under § 510(b), however, the Court must determine the second legal issue of whether that claim *arose from* Interbanc's purchase or sale of the Debentures.

■ Section 510(b) of the Bankruptcy Code states that a "claim *arising from* rescission of a purchase or sale of a security of the debtor ... for damages *arising from* the purchase or sale of such a security ... shall be subordinated[.]" Pursuant to this provision, Claim Number 102 will be subordinated to the claims of the general unsecured creditors if the claim and the damages Interbanc allegedly incurred *arise from* the purchase or sale of NALF security. The Committee argues that Claim Number 102 and Interbanc's damages do arise from Interbanc's purchase of NALF security. Interbanc counters that its claim and damages arise from NALF's failure to register the Debentures, a subsequent, independent act that is the basis for the three causes of action alleged in the Complaint to the Circuit Court Case. In its Proof of Claim, Interbanc lists the Circuit Court Case as the basis for Claim Number 102. The Complaint filed in that case states that the action (comprising the three causes of action) is for damages resulting from NALF's failure to register the Debentures on or before May 15, 1996 (as required by the Securities Purchase Agreement and the Registration Rights Agreement) and NALF's failure to register the Debentures for a subsequent stock offering. Thus, NALF's failure to register the Debentures for two stock offerings is the basis for Claim Number 102. Although Interbanc agrees with this conclusion, Interbanc disputes that Claim Number 102 *arises from* the purchase of the Debentures

■ The precise meaning of the phrase "arising from" in § 510(b) is at the crux of this Court's determination of

---

**4.** *See Zaklama v. Mount Sinai Medical Center, P.A.*, 906 F.2d 650, 652 (11th Cir.1990) (finding that the interpretation of a contract is an issue of law).

whether Claim Number 102 is a claim under that provision. The word "arise," according to Black's Law Dictionary, means "to spring up, originate, to come into being or notice, to become operative[.]" BLACK'S LAW DICTIONARY 138 (rev. 4th ed.1968). The phrase "arising from" signifies some causal connection. *See* BLACK'S LAW DICTIONARY 108 (6th ed.1990) (defining "arising out of"); *In re Granite Partners, L.P.*, 208 B.R. 332, 339 (Bankr. S.D.N.Y.1997). A literal reading of § 510(b) reveals that the damages must flow from the actual purchase or sale of the security. *See Granite Partners*, 208 B.R. at 339. A broader reading, however, "suggests that the purchase or sale must be part of the causal link although the injury may flow from a subsequent event." *Id.* This Court adopts the broader reading of § 510(b). Because NALF would not have failed to register the Debentures and thus Interbanc would not have incurred any damages if Interbanc did not purchase the Debentures in the first place, the purchase is a causal link. *See id.*

In determining whether Claim Number 102 arises from the purchase or sale of the Debentures, the Court notes initially that NALF's failure to register the Debentures did not occur during the actual purchase or sale of those Debentures. NALF failed to register the Debentures at the two stock offerings following the 1995 execution of the Securities Purchase Agreement. This does not necessarily mean, however, that Interbanc's claim for damages did not arise from the execution of that agreement. The Securities Purchase Agreement and the contemporaneously executed Registration Rights Agreement both required that NALF use its best efforts to register the Debentures on or before May 15, 1996. Because NALF allegedly failed to do so by omitting the Debentures from two subsequent NALF stock offerings, NALF arguably breached the two agreements. In general, a breach of contract occurs subsequent to the execution of the underlying contract. The non-breaching party's cause of action for breach of contract nevertheless arises from the execution of the contract.[5] *See Bankers Trust Co. v. Pacific Employers Ins. Co.*, 282 F.2d 106, 110 (9th Cir.1960), *cert. denied*, 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961); *HTP, Ltd., v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla.1996); *Williams v. Peak Resorts Int'l Inc.*, 676 So.2d 513, 516 (Fla. 5th DCA 1996); *Ashland Oil, Inc. v. Pickard*, 269 So.2d 714, 723 (Fla. 3d DCA 1972), *cert. denied*, 285 So.2d 18 (Fla.1973). Logically, there can be no breach of contract without the execution of the contract. Similarly, there can be no breach of fiduciary duty without the execution of a contract that establishes the fiduciary duty and no fraudulent inducement without a contract into which a party was fraudulently induced to enter.

In the instant case, Interbanc argues that Claim Number 102 should not be subordinated because its damages did not arise from the "purchase or sale" of the Debentures under § 510(b). Instead, Interbanc suggests that its damages arose from NALF's failure to register the Debentures with the SEC, a wrongful act independent of and committed subsequent to Interbanc's purchase of the Debentures. Interbanc further asserts that this failure prevented Interbanc from selling the shares and making a profit. The Bankruptcy Court for the Southern District of

---

5. Similarly, the non-breaching party's cause of action for breach of fiduciary duty *arises from* the execution of the contract that establishes the fiduciary duty. Moreover, if a party to a contract is fraudulently induced to enter into a contract, that party's cause of action for fraudulent inducement *arises from* the execution of the contract the party was fraudulently induced to enter into. "It is the law that one who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refuses to perform the contract as it stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract." *Bankers Trust Co. v. Pacific Employers Ins. Co.*, 282 F.2d 106, 110 (9th Cir.1960), *cert. denied*, 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961).

New York, in *In re Granite Partners, L.P.*, 208 B.R. 332, 342 (Bankr.S.D.N.Y. 1997), addressed the subordination of a claim within a similar factual context. In *Granite Partners*, the investor claimed that the debtors wrongfully deprived them of the opportunity to profit from their investment (or minimize their losses) by supplying misinformation which affected their decision to sell. *See id.* In holding that the investor's claim of post-investment fraud should be subordinated to the creditors' claims pursuant to § 510(b), the *Granite Partners* Court reasoned:

> Just as the opportunity to sell or hold belongs exclusively to the investors, the risk of illegal deprivation of that opportunity should too. In this regard, there is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and post-investment fraud that *adversely affects the ability to sell* (or hold) the investment; both are investment risks that the investors have assumed.

*Id.* (emphasis added). In the instant case, Interbanc argues that NALF's failure to register the Debentures adversely affected Interbanc's ability to convert the Debentures and sell the Restricted Stock. In accordance with the *Granite Partners* Court's reasoning, there is no distinction between fraud committed during the purchase of securities and fraud (or a wrongful act) committed subsequent thereto that adversely affects one's ability to sell those securities. They are both claims that arise from the purchase or sale of securities. Therefore, even though NALF allegedly committed the wrongful act underlying Claim Number 102 subsequent to Interbanc's purchase of the Debentures, the Court finds that the subsequent wrongful act is no different than a fraud committed during the purchase for purposes of determining whether Claim Number 102 should be subordinated under § 510(b).

In formulating § 510(b), Congress sought to combat a very specific type of problem that arises when a business files for bankruptcy. *See In re Wyeth Company*, 134 B.R. 920, 921 (Bankr.W.D.Mo. 1991).

> A difficult policy question to be resolved in business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a purchase: should he be treated as a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated?

H.Rep. No. 595, 95th Cong., 1st Sess. 194 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6154. The Bankruptcy Court for the Western District of Missouri, in *In re Wyeth Company*, after reviewing the legislative history of § 510(b) explained that Congress'

> concern was that an equity holder could elevate his claim to that of an unsecured creditor through a claim for rescission of his purchase of the debtor's securities or a tort claim for damages arising out of his purchase of the debtor's securities.... Section 510(b) seeks to prevent that from occurring. The philosophy behind this code section is that in bankruptcy where there is fraud or illegality in the sale of securities, it is the purchaser of the securities that must bear that risk. By allowing an equity holder asserting a rescission or tort damage claim to share pari passu with unsecured creditors, the unsecured creditors are forced to bear that risk. But subordination of rescission or tort damage claims arising out of an illegal stock transaction keeps the risk where it belongs, i.e., upon the shoulders of the equity purchaser.

134 B.R. 920, 921–22 (Bankr.W.D.Mo.1991) citing H.Rep. No. 595, 95th Cong., 1st Sess. 194–96 (1977) (citations omitted). *See also Jenkins v. Tomlinson (In re Basin Resources Corporation)*, 190 B.R. 824, 826 (Bankr.N.D.Tex.1996) (discussing the policy considerations and risk allocation underlying § 510(b)).

The court in *Granite Partners* also discussed the theory of risk allocation that underlies Congress' subordination of claims for damages arising from the purchase or sale of securities. *See* 208 B.R. at 336 (citing John J. Slaim and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors*, 48 N.Y.U.L.Rev. 261 (1973)). The *Granite Partners* Court first explained that two different types of risk are allocated in § 510(b): (1) the risk of the debtor's insolvency, and (2) the risk of illegality in the issuance of the debtor's securities. The court then described to what extent these risks are assumed by the investors and creditors of a debtor:

> [B]oth investors and creditors accept the risk of enterprise insolvency but to a different degree. This stems from their dissimilar expectations. Even if the business prospers, the creditor anticipates no more than the repayment of his fixed debt. Further, the shareholder's investment provides an equity cushion for the repayment of the claim. The investors, on the other hand, share the profits to the exclusion of the creditors. The shareholder's enhanced risk of insolvency represents the flipside of his unique right to participate in the profits. The allocation of the risk, as between the investor and the creditor, is reflected in the absolute priority rule,[6] and should not be reallocated.

> In contrast, investors alone bear the risk of illegality in the issuance of securities. Moreover, no basis exists to shift any portion to creditors who are not offered the stock. . . . [A] shareholder's fraud claim cannot be treated equally with the claims of general creditors. This improperly reallocates this risk to the latter class that has relied on the equity cushion in extending credit to the debtor.

*Id.* (citations omitted). Although this risk allocation pertains to claims arising from fraud in the issuance of securities, the *Granite Partners* Court warned against adopting such a restrictive interpretation of § 510(b). *See* 208 B.R. at 337; *In re Public Service Company of New Hampshire*, 129 B.R. 3, 5 (Bankr.D.N.H.1991) (holding that the language of § 510(b) is broad enough to include fraud, violations of securities law, breach of contract, and related causes of action against the debtor). *But see Limited Partners' Committee of Amarex, Inc. v. Official Trade Creditors' Committee of Amarex, Inc. (In re Amarex, Inc.)*, 78 B.R. 605 (W.D.Okla. 1987) (holding that the legislative history, the clear language, and the underlying policies and purposes of § 510(b) dictate that the automatic subordination required by § 510(b) should extend no further than the initial legality; § 510(b) "does not encompass claims based upon conduct by the issuer of the security which occurred after this event."). In arriving at its more expansive interpretation of § 510(b), the *Granite Partners* Court reviewed Second and Ninth Circuit cases addressing the Bankruptcy Act's corresponding provision to § 510(b),[7] examined the language and legislative history of § 510(b), compared federal statutes and rules containing language similar or relating to § 510(b),[8] and

---

**6.** The absolute priority rule is a fundamental rule of bankruptcy law whereby certain claimants, e.g., creditors and investors, are classified in such a way that one class is given priority over another with respect to collecting pursuant to their respective claims. Under this rule, "the creditors stand ahead of the investors on the receiving line; the enterprise cannot distribute profits until it satisfies its creditors' claims." The rule reflects the different degree to which each class assumes the risk of the debtor's insolvency. *See Granite Partners*, 208 B.R. at 337, 344.

**7.** *See In re Stirling Homex Corp.*, 579 F.2d 206 (2d Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979); *Falcon Capital Corp. Shareholders v. Osborne (In re THC Fin. Corp.)*, 679 F.2d 784 (9th Cir.1983).

**8.** *See* 18 U.S.C. § 1964(c) (the Rico Amendment enacted as part of the 1995 Private

challenged the reasoning of two courts that adopted a restrictive interpretation of § 510(b). After doing so, the *Granite Partner*'s Court concluded that subsequent post-investment fraudulent activity, such as fraudulent maintenance or retention of securities, relate back to the original purchase of the securities,[9] and so "arise from a purchase or sale of the debtor's securities within the meaning of section 510(b), and must be subordinated." 208 B.R. at 342. "This conclusion ... advances the policy choice that Congress made in enacting section 510(b). Further, a contrary ruling would eviscerate the absolute priority rule, and shift to creditors the investment risk assumed by the [investors]." *Id.*

This Court is persuaded by the *Granite Partners* Court's conclusion. Interbanc's causes of action for breach of contract, breach of fiduciary duty, and fraudulent inducement, which stem from NALF's failure to register the Debentures, *arise from* the execution of the Securities Purchase Agreement and the Registration Rights Agreement. Interbanc would not have these causes of action against NALF had the parties not entered into these agreements. Because Claim Number 102 is based on the three causes of action, it too *arises from* the execution of the two agreements (and thus arises from Interbanc's purchase of the Debentures). Therefore, as Claim Number 102 is a "claim ... for

damages *arising from* the purchase or sale of ... a security[,]" the Court finds that it is a claim within the meaning of § 510(b) of the Bankruptcy Code. 11 U.S.C. § 510(b) (emphasis added). As such, Claim Number 102 shall be subordinated to the claims of NALF's general unsecured creditors and have the same priority as other equity security holders (Class 9) under NALF's plan of reorganization, pursuant to 11 U.S.C. § 510(b).[10]

## CONCLUSION

The Committee's Motion for Summary Judgment seeks to subordinate Claim Number 102 to the claims of NALF's general unsecured creditors pursuant to 11 U.S.C. § 510(b). Because there are no genuine issues of material fact, Summary Judgment as to the legal issues before the Court is appropriate. In regard to the first legal issue, the Court finds that the Debentures are security within the meaning of § 510(b). With respect to the second legal issue, the Court holds that Claim Number 102 arose from the purchase or sale of the Debentures and so is a claim within the meaning of § 510(b). Therefore, pursuant to this provision of the Bankruptcy Code, Claim Number 102 shall be subordinated to the claims of NALF's general unsecured creditors and have the same priority as equity security holders (Class 9) under NALF's Plan.

---

Securities Litigation Reform Act); Section 10(b) of the Securities Exchange Act of 1934 (June 6, 1934, ch. 404, 48 Stat. 881) and Rule 10B–5 promulgated thereunder.

9. The Bankruptcy Court for the District of New Hampshire, in *Public Service Company*, 129 B.R. at 5, also adopted a broad interpretation of § 510(b). In *Public Service Company*, an investor allegedly incurred damages as a result of the debtor's suspending the convertibility of certain debentures and warrants. The investor filed a complaint against the debtor alleging fraud, violations of securities law, and breach of contract. The court in *Public Service Company* held that "the language of § 510(b) is broad enough to include breach of contract and related actions as well." The Court concluded that the inves-

tor's claim underlying these causes of action should be subordinated to the claims of general unsecured creditors pursuant to § 510(b).

10. In addition to its assertion that Claim Number 102 does not arise from the purchase or sale of the Debentures, Interbanc claims to be a creditor and not an investor for purposes of the absolute priority rule. For both of these reasons, Interbanc asserts that Claim Number 102 should not be subordinated to the claims of NALF's general unsecured creditors like the claims of NALF's investors will be. The Court disagrees. In accordance with the language in the Securities Purchase Agreement and the Bankruptcy Code's definition of security, the Court finds that Interbanc is an investor and not a creditor for purposes of the absolute priority rule.

## ORDER

In accordance with the foregoing analysis and with the Court being otherwise fully advised in the premises, it is hereby **ORDERED AND ADJUDGED** that:

1. Summary Judgment is entered in favor of the Committee.

2. Interbanc is an equity security holder and not a creditor for purposes of the absolute priority rule and 11 U.S.C. § 510(b).

3. Claim Number 102 arose from the purchase or sale of the Debentures and so is a claim within the meaning of 11 U.S.C. § 510(b).

4. Pursuant to 11 U.S.C. § 510(b), Claim Number 102 shall be subordinated to the claims of NALF's general unsecured creditors and have the same priority as other equity security holders (Class 9) under NALF's Plan.

5. Pursuant to Federal Rule of Bankruptcy Procedure 9021, a separate Final Judgment incorporating these findings of fact and conclusions of law will be entered contemporaneously herewith.

## FINAL JUDGMENT

**THIS MATTER** came before the Court on March 9, 1999, upon the Official Committee of Unsecured Creditors' (the "Committee") *Motion for Summary Judgment Against Interbanc Mortgage Services, Inc.* (the "Motion for Summary Judgment"). On March 23, 1999, Interbanc Mortgage Services, Inc. ("Interbanc") filed a *Response to the Committee's Motion for Summary Judgment* (the "Response"). On March 25, 1999, Interbanc filed the *Affidavit of Paul Henderson in Opposition to Motion for Summary Judgment filed by Committee Against Interbanc Mortgage Services* ("Henderson's Affidavit"). Subsequently, on April 5, 1999, the Committee filed a *Reply Memorandum of Law in Support of its Motion for Summary Judgment Against Interbanc Mortgage Services, Inc.* (the "Reply"). The parties filed a Joint Stipulation of Facts on April 9, 1999. Then, on April 26, 1999, Interbanc filed a *Response to the Committee's Reply Memorandum of Law in Support of its Motion for Summary Judgment* (the "Response to the Reply"). Having reviewed the Motion for Summary Judgment, the Response, Henderson's Affidavit, the Reply, the Joint Stipulation of Facts, and the Response to the Reply, the Court finds that there are no genuine issues of material fact and so summary judgment is appropriate. *See Clemons v. Dougherty County,* 684 F.2d 1365, 1368 (11th Cir.1982) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The Court, therefore, entered the *Findings of Fact, Conclusions of Law, and Order on the Official Committee of Unsecured Creditors' Motion for Summary Judgment Against Interbanc Mortgage Services, Inc.*

In accordance with the *Findings of Fact, Conclusions of Law, and Order on the Official Committee of Unsecured Creditors' Motion for Summary Judgment Against Interbanc Mortgage Services, Inc.* and with the Court being otherwise fully advised in the premises, it is hereby **ORDERED AND ADJUDGED** that:

1. Summary Judgment is entered in favor of the Committee.

2. Interbanc is an equity security holder and not a creditor for purposes of the absolute priority rule and 11 U.S.C. § 510(b).

3. Claim Number 102 arose from the purchase or sale of the Debentures and so is a claim within the meaning of 11 U.S.C. § 510(b).

4. Pursuant to 11 U.S.C. § 510(b), Claim Number 102 shall be subordinated to the claims of NALF's general unsecured creditors and have the same priority as other equity security holders (Class 9) under NALF's Plan.

**DONE AND ORDERED.**