**In re INTERNATIONAL WIRELESS COMMUNICATIONS HOLDINGS, INC., International Wireless Communications, Inc., Radio Movil Digital Americas, Inc., International Wireless Communications Latin America Holdings, Ltd., and Pakistan Wireless Holdings Limited, Debtors.**

**Nos. 98–2007 (MFW) through 98–2011 (MFW).**

United States Bankruptcy Court, D. Delaware.

Jan. 23, 2001.

Pauline K. Morgan, M. Blake Cleary, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Allan L. Gropper, White & Case, LLP, New York City, for Debtors.

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, Wilmington, DE, Shalom L. Kohn, Anne Marie Bredin, Sidley & Austin, Chicago, IL, for Ronald B. Frankum and Charles F. Wasaff.

William H. Sudell, Jr., Morris Nichols Arsht & Tunnell, Wilmington, DE, James E. Millstein, Lindsee P. Granfield, Andrea L. Spalla, Cleary Gottlieb Steen & Hamilton, New York City for the Informal Committee of Minority Shareholders.

Daniel K. Astin, Richard Shepacarter, Office of the United States Trustee, Philadelphia, PA.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the objection of International Wireless Communications

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant

Holdings, Inc. ("IWCH"), International Wireless Communications, Inc. ("IWC"), Radio Movil Digital Americas, Inc. ("RMDA"), International Wireless Communications Latin America Holdings, Ltd. ("IWCLA"), and Pakistan Wireless Holdings Limited ("PWH") (collectively "the Debtors") to the claim of Ronald B. Frankum, Y.F. Severn Limited (a successor in interest to part of Frankum's claim) and Charles R. Wasaff (collectively "F & W"). That objection seeks to subordinate F & W's claim pursuant to section 510(b) of the Bankruptcy Code.

## I. FACTUAL BACKGROUND

IWCH, one of the Debtors herein, is a holding company which owns interests in operating companies that provide cellular and wireless telecommunications services in foreign countries. The Debtors have no operations of their own; rather, they simply hold interests in operating companies in Asia and Latin America. Those investments are typically minority positions and have required that the Debtors provide substantial continued funding through capital calls and other capital obligations.

On July 17, 1997, Continental Communications Limited ("CCL") and International Wireless Communications Pakistan Limited ("IWCPL") entered into the Share Purchase Agreement. (Exhibit C–5.) Pursuant to that agreement, CCL transferred approximately 8 million shares of Pakistan Mobile Communications (Pvt) Ltd. ("Pakistan Mobile") to IWCPL in exchange for $10 million and approximately 500,000 shares of IWCH.

On or about August 8, 1997,[2] IWCH and CCL executed the Supplement to the Share Purchase Agreement ("the Supple-

ment"). (Exhibit C–6.) The Supplement required IWCH to consummate an initial public offering ("the IPO") of its stock within 18 months, which would permit CCL to sell the stock being given to it. If IWCH did not timely consummate the IPO, there were several alternative remedies available to CCL. Among those remedies, was the right of CCL, on written notice to IWCH, to require IWCH (a) to issue approximately 50,000 additional shares of IWCH stock to CCL each year until an IPO is consummated or (b) to file a registration statement covering the IWCH stock held by CCL thereby permitting CCL to sell its stock. (Exhibit C–6 at § 2.3.) If an IPO was consummated as originally contemplated, or if CCL exercised its rights under section 2.3 of the Supplement to sell its stock, but CCL received less than $6,159,000, then IWCH would be obligated to issue additional stock to CCL so that the total value received by CCL was $6,159,000.

As a result of liquidity problems, the Debtors filed chapter 11 petitions on September 3, 1998, before the 18–month deadline to consummate an IPO under the Supplement. The Debtors filed a pre-negotiated Joint Plan of Reorganization. After a contested confirmation hearing held on February 3, 1999, the Debtors filed an amendment to the Plan on March 22, 1999. After considering the objections to confirmation, we confirmed the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization, as Modified, by Order dated March 26, 1999.

Prior to confirmation, F & W, as successor in interest to CCL, filed a claim in the amount of $6,159,000 against IWCH. F &

to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

**2.** The Supplement is undated, and there was no evidence presented as to the date it was executed. However, the document appears to have been prepared (or last revised) on August 8, 1997. The Supplement was preceded

by a term sheet dated June 5, 1997, and a letter revising the term sheet dated June 18, 1997. (Exhibits C–3 & C–4.) The Share Purchase Agreement specifically provides that the IWCH shares being issued as part of the purchase price were to be subject to the rights outlined in the term sheet, as modified by the June 18, 1997, letter. (Exhibit C–5 at § 2(b).)

W subsequently filed an amended claim in the same amount. In their First Omnibus Objection to Claims, the Reorganized Debtors objected to the F & W claim, asserting that the claim should be subordinated pursuant to section 510(b). Alternatively, the Debtors assert that F & W's claim should be treated as an equity interest.

F & W responded to the objection and appeared in opposition at the hearing held on June 29, 2000. After considering the evidence presented at the hearing and the parties' briefs, we sustain the objection to the extent that it seeks to subordinate F & W's claim pursuant to section 510(b).[3]

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## III. DISCUSSION

### A. Burden of Proof

■ Initially, a claimant must allege facts sufficient to support a legal basis for the claim. If the assertions in the filed claim meet this standard of sufficiency, the claim is prima facie valid pursuant to Bankruptcy Rule 3001(f). *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir.1992). If no party in interest objects to the claim, it is deemed allowed under section 502(a). If an objection is filed, the objecting party bears the initial burden of presenting sufficient evidence to overcome the presumed validity and amount of the claim. *See Smith v. Sprayberry Square Holdings, Inc. (In re Smith)*, 249 B.R. 328, 332–33 (Bankr.S.D.Ga.2000) (citations omitted). "If the objecting party overcomes the prima facie validity of the claim, then the burden shifts to the claimant to prove its claim by a preponderance of the evidence." *Id.*

### B. Section 510(b)

■ The Debtors assert that section 510(b) mandates subordination of the F & W claim. "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). *See also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("In interpreting a statute a court should always turn first to one cardinal canon before all others.... Courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Section 510(b) provides:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

The Debtors assert that F & W's claim arises from the purchase of IWCH stock which was given as part of the consideration for the sale of CCL's stock in Pakistan Mobile. Therefore, the Debtors argue that F & W's claim is one "for damages arising out of the purchase or sale of [the debtor's] security," and is, therefore, subordinated under section 510(b).

F & W asserts four reasons why its claim should not be subordinated pursuant to section 510(b). First, F & W asserts

---

**3.** Because we conclude that F & W's claim should be subordinated pursuant to section 510(b), we find it unnecessary to determine whether F & W's claim is an equity interest.

that its claim does not arise from the "purchase or sale" of the Debtors' stock but from CCL's sale of the Pakistan Mobile stock. Second, F & W asserts that its claim is not a claim for damages arising from the purchase of the stock but for damages arising from breach of a separate agreement, the Supplement, which occurred after the stock was received. Third, F & W argues that subordination under section 510(b) applies only to tort claims for recission and securities fraud, not to claims based on breach of contract. Fourth, F & W asserts that its claim should not be subordinated under section 510(b) because the breach which gave rise to its claim occurred post-petition.

### 1. *Sale of Debtor's security*

█ F & W asserts that its claim is not governed by section 510(b) because its claim does not arise from the "purchase or sale" of the Debtor's stock but from CCL's sale of the Pakistan Mobile stock to IWCPL. In support, F & W cites the language of the Share Purchase Agreement which states that the stock being "purchased" is the Pakistan Mobile stock, not the IWCH stock. Additionally, F & W presented testimony that the transaction essentially involved the sale of the Pakistan Mobile stock and that CCL did not want to purchase IWCH stock but only took it because IWCPL did not have sufficient cash to pay for the Pakistan Mobile stock.

█ We reject F & W's argument on this point. The fact that the Share Purchase Agreement dealt with the sale/purchase of Pakistan Mobile stock does not eliminate the possibility that it also dealt with the sale/purchase of IWCH stock as well. *See, e.g., Baldwin United Corporation v. Adams (In re Baldwin United Corporation )*, 52 B.R. 539, 540 n. 1 (Bankr. S.D.Ohio 1985) (exchange of shares of debtor for shares of another company constitutes "sale or purchase" of stock of debtor pursuant to section 510(b)). Although the Share Purchase Agreement

states that its purpose is to sell the Pakistan Mobile stock, it also states that the compensation for the Pakistan Mobile stock will be partially in the form of IWCH stock. Thus, the Share Purchase Agreement is an agreement for the purchase of the IWCH stock.

The testimony of Mr. Frankum that CCL did not "want" the IWCH stock and instead wanted cash is irrelevant. The Share Purchase Agreement, as ultimately executed, provided for the transfer of IWCH stock as partial compensation for the Pakistan Mobile stock. Thus, there was a "purchase" of stock of one of the Debtors, IWCH.

### 2. *Damages arising from purchase of stock*

#### (a) *Separate agreements*

█ We also reject F & W's argument that its claim is not a claim for damages "arising" from the purchase of the Debtor's stock because its claim arises from the Debtor's breach of the Supplement, not the Share Purchase Agreement. The Share Purchase Agreement states that the purchase price for the Pakistan Mobile stock includes the IWCH stock "to be held on and subject to and with the benefit of the terms of the letter dated June 18, 1997." (Exhibit C–5 at § 2(b).) The agreement encompassed in the June 18 letter and term sheet was reduced to writing and executed as the Supplement to the Share Purchase Agreement. (Exhibits C–3, C–4 & C–6.)

Thus, we conclude that the Supplement was encompassed in the Share Purchase Agreement. The fact that the two agreements are separate documents executed at different times is irrelevant. The Supplement was an agreement by IWCH to assure CCL, in connection with its agreement to accept IWCH stock in exchange for the Pakistan Mobile stock, that the IWCH stock had a sufficient value. The breach of that agreement, upon which F & W's claim rests, creates damages which do

"arise from the purchase or sale of a security of the debtor" as contemplated by section 510(b).

To hold otherwise would allow shareholders to elevate their claims for damages from sale or purchase of a debtor's securities to general unsecured status simply by having their rights set forth in a document separate from the purchase agreement. *See, e.g., In re NAL Fin. Group, Inc.,* 237 B.R. 225, 230 (Bankr. S.D.Fla.1999) (court concluded that claim based on four separate contracts—security purchase agreement, registration rights agreement, convertible debentures agreement, and warrant agreement—constituted a claim arising from the purchase of a security).

### (b) *Arising after the purchase*

F & W argues that its claim did not arise from its purchase of the IWCH stock because it did not arise until 18 months later when IWCH failed to consummate the IPO.

As noted by the *NAL Financial* Court, a claim for breach of contract does not arise when the breach occurs but when the underlying contract was executed.

> In general, a breach of contract occurs subsequent to the execution of the underlying contracts. The non-breaching party's cause of action for breach of contract nevertheless arises from the execution of the contract.

*NAL Financial,* 237 B.R. at 231. Since we found above that the Share Purchase Agreement incorporated the terms of the Supplement, we conclude that the breach of the Supplement was a breach of the Share Purchase Agreement. Thus F & W's claim arises at the time of the purchase of IWCH's stock.

*NAL Financial* is almost directly on point. In that case, the claimant brought a claim similar to the one asserted by F & W for damages resulting from the debtor's breach of a registration rights agreement which required the debtor to register securities by a deadline. The *NAL Financial* Court granted summary judgment and subordinated the claim, holding that:

> [T]here is no distinction between fraud committed during the purchase of securities and fraud (or a wrongful act) committed subsequent thereto that adversely affects one's ability to sell those securities. They are both claims that arise from the purchase and sale of securities. Therefore, even though [the debtor] allegedly committed the wrongful act underlying [the claim] subsequent to the claimant's purchase of the Debentures, the Court finds that the subsequent wrong act is no different than a fraud committed during the purchase for purposes of determining whether [the claim] should be subordinated under section 510(b).

*NAL Financial,* 237 B.R. at 232 (citations omitted).

We find further support for our conclusion in the *Granite Partners* decision. *In re Granite Partners,* 208 B.R. 332 (Bankr. S.D.N.Y.1997). In analyzing section 510(b), the Court considered the language of the section and found it ambiguous with respect to damages caused by fraudulent conduct after the stock is purchased.

> Initially, the phrase "arising from the purchase or sale" is ambiguous, at least with respect to fraudulent maintenance claims. Something "arises" from a source when it originates from that source. Webster's New International Dictionary 117 (unabridged ed.1976); Black's Law Dictionary 108 (6th ed.1990). The phrase "arising from" signifies some causal connection. Cf. Black's Law Dictionary 108 (defining "arises out of"). A literal reading implies that the injury must flow from the actual purchase or sale; a broader reading suggests that the purchase or sale must be part of the causal link although the injury may flow from a subsequent event. Since the fraudulent maintenance claims cannot exist without the initial purchase, the purchase is a causal link. Reasonably well-informed persons

could interpret section 510(b) in either sense, and hence, the section is ambiguous.

*Granite Partners*, 208 B.R. at 339. The Court then noted that section 510(b) included claims for fraud in initially inducing the shareholders to buy stock, as well as claims for fraudulently inducing the shareholders to hold onto and not sell their stock, because:

> [t]he charge of continuing concealment cannot exist independent of the initial fraudulent sale, i.e., without fraud in the inducement, there cannot be a wrongful concealment. Further, absent subordination, the [shareholders] can avoid section 510(b)'s mandate simply by ignoring the purchase and claiming that the debtors concealed their prior misrepresentations the day after the sale.

*Id.* at 342.

The Court concluded that section 510(b) must also apply to claims where investors are fraudulently induced to retain their stock, even where there was no fraud committed when they initially bought the stock.

> Unlike the continuing concealment claim, the investor need not assert that he is a defrauded purchaser. Nevertheless, section 510(b) also subordinates this claim. First, from the creditors' point of view, it does not matter whether the investors initially buy or subsequently hold on to their investments as a result of fraud. In either case, the enterprise's balance sheet looks the same, and the creditors continue to rely on the equity cushion of the investment. Second, a fraudulent retention claim involves a risk that only the investors should shoulder. In essence, the claim involves the wrongful manipulation of the information needed to make an investment decision. The [claimants's] charge that the debtors' [sic] wrongfully deprived them of the opportunity to profit from their investment (or minimize their losses) by supplying misinformation which affected their decision to sell. Just as the opportunity to sell or hold belongs exclusively to the investors, the risk of illegal deprivation of that opportunity should too. In this regard, there is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and post-investment fraud that adversely affects the ability to sell (or hold) the investment; both are investment risks that the investors have assumed. [fn 11]

> [FN 11] Moreover, the contrary conclusion can lead to an anomalous result. By holding on to their investment in the face of post-investment misinformation, the [claimants] purport to assert a non-section 510(b) claim. If, instead, a member sold his interest to a third party who relied on the same misinformation, the buyer would hold only a subordinated claim.

*Granite Partners*, 208 B.R. at 342 n. 11.

The instant case is similar. Although F & W does not assert that fraudulent activity caused it to buy or hold onto its shares, it does assert that the Debtor's later breach of contract (by not consummating an IPO timely or issuing additional stock to it) prevented it from selling its stock or realizing the value of its investment. The essence of its claim is that of a shareholder. Although the "injury" committed by the Debtor is separated—by time and action—from the initial purchase of the Debtor's stock, it is still causally linked.

F & W relies on *In re Amarex, Inc.*, 78 B.R. 605 (W.D.Okla.1987) in which the District Court held that section 510(b) does not apply to a shareholder claim based on fraudulent conduct by the debtor *after* the purchase of stock. In *Amarex*, the Court concluded that "Section 510(b) pertains only to claims based upon the alleged wrongful issuance and sale of the security and does not encompass claims based on conduct of the issuer of the security which occurred after this event." 78 B.R. at 610. *See also In re Angeles Corp.*, 177 B.R. 920, 927–28 (Bankr.C.D.Cal.1995), *aff'd,* 199

B.R. 220 (9th Cir. BAP 1996) (shareholder claims based on mismanagement after purchase of stock not subordinated pursuant to section 510(b)).

We decline to follow the *Amarex* and *Angeles* cases because we conclude that *Granite Partners* and *NAL Financial* are better reasoned. The nature of F & W's claim is premised on the value of the IWCH stock. Although the alleged wrongful act occurred after the transfer of the stock of IWCH to F & W and involved the failure of IWCH to consummate an IPO, it is still a claim for damages suffered by F & W as a result of its purchase of stock in IWCH. Thus, we conclude that it is covered by section 510(b).

### 3. *Breach of contract v. tort claim*

■ F & W argues that its claim is for breach of contract, not tort and, thus, is not subject to subordination under section 510(b). It cites Judge Walsh's decision in *In re Mid–American Waste Systems, Inc.*, 228 B.R. 816, 825 & n. 5 (Bankr.D.Del. 1999) which emphasized Congress's intent in enacting section 510(b) to subordinate tort claims for rescission or securities fraud. However, Judge Walsh noted in that decision that "Although it is correct that the principal focus of Congress in 1978 was to subordinate shareholder securities law claims, Congress's intent was not so limited." *Id.*

■ "Where the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000)( *quoting Ron Pair,* 489 U.S. at 240, 109 S.Ct. 1026 (internal quotes omitted)). "As long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *Ron Pair,* 489 U.S. at 241, 109 S.Ct. 1026. The express language of section 510(b) contains no limitation to claims based on tort.

Therefore, the legal theory on which a shareholder's claim is based, tort or contract, should not be a relevant consideration. *See also In re Public Serv. Co. of New Hampshire,* 129 B.R. 3, 5 (Bankr. D.N.H.1991) ("the language of 510(b) is broad enough to include breach of contract and related actions as well").

Many claims of "defrauded" shareholders could be characterized as either. Were we to limit the applicability of section 510(b) to tort claims, shareholders could easily avoid its effect by asserting that a debtor's fraudulent conduct in the sale of its securities was a breach of the sales contract. We therefore conclude that section 510(b) applies to F & W's claim even though it is characterized as a breach of contract claim.

In *Granite Partners,* the Court held that the fundamental inquiry in determining whether section 510(b) is applicable to a securities-related transaction is the nature of the claim. 208 B.R. at 338. The Court considered the difference in treatment of creditors and interest holders under the Bankruptcy Code in the context of their expectations:

> [B]oth investors and creditors accept the risk of enterprise insolvency but to a different degree.... This stems from their dissimilar expectations. Even if the business prospers, the creditor anticipates no more than the repayment of his fixed debt. Further, the shareholder's investment provides an equity cushion for the repayment of the claim.... The investors, on the other hand, share the profits to the exclusion of the creditors. The shareholder's enhanced risk of insolvency represents the flipside of his unique right to participate in the profits. The allocation of the risk, as between the investor and the creditor, is reflected by the absolute priority rule, and should not be reallocated.

*Id.* at 336 (citations omitted).

In this case, CCL, by obtaining stock in IWCH, was accepting the benefits, as well

as the risks, inherent in that investment. For example, CCL stood to benefit from any increase in the value of the IWCH stock. While CCL sought to reduce its risk as a shareholder by contract, it did not completely eliminate it.[4] It remained, at all times, a shareholder. The Supplement was executed in conjunction with the Share Purchase Agreement. It was executed at a time when CCL was a shareholder of IWCH and is clearly an agreement dealing with CCL's rights as a shareholder. Therefore, any claim for breach of that contract is truly a claim based on F & W's status as a shareholder.

F & W asserts that *Granite Partners* is distinguishable and should not be the basis for a conclusion that its claim is subordinated. It notes that the *Granite Partners* Court concluded that the claim for fraudulent maintenance (fraud in inducing the shareholder to hold onto its stock) "arose" from the purchase of stock given its similarity to a claim for fraudulent inducement to purchase the stock in the first place. In contrast, F & W asserts that its claim is not for fraudulent inducement or maintenance but for breach of contract.

We conclude that this difference is not relevant. The essence of F & W's claim is that the Debtor did not maintain the value of its stock. In fact, the Supplement provided that if the stock did not have a set value, the Debtor would not pay F & W cash but instead would simply issue additional stock. (Exhibit C–6 at § 2.3.) Thus, the F & W claim is for failure of the Debtor to issue that additional stock, which we conclude is a claim "arising from the purchase or sale of a security of the debtor."

In support of its position, F & W cites *In re Motels of America, Inc.,* 146 B.R. 542 (Bankr.D.Del.1992) where the Court concluded that the claim of a former employee and shareholder for breach of a contract to pay for its stock was not subordinated under section 510(b). This case is distinguishable from that case because in *Motels of America* the agreement at issue had divested the claimant "of all of the indicia of ownership." 146 B.R. at 543. Those benefits had been transferred to the debtor who had agreed to pay the claimant over a specified period of time. The Court concluded that the claim for breach of that agreement was not subordinated by section 510(b) since the claimant was not a shareholder at that time. *Id.* By contrast, in this case CCL (and F & W) at all times retained their rights (and expectations) as shareholders.

This case is similarly distinguishable from the recent case of *Montgomery Ward Holding Corp v. Schoeberl (In re Montgomery Ward Holding Corp.),* slip op., Bankr.No. 97–1409, Adv. No. 99–560 (Bankr.D.Del. Jan. 16, 2001). In *Montgomery Ward,* Judge Walsh held that section 510(b) was not applicable to a claim based on the debtor's default of a promissory note issued in partial payment for stock redeemed from the claimant. *Montgomery Ward,* slip op. at 8–17. The Court concluded that the claim was not one for damages resulting from the purchase or sale of the debtor's stock. Instead, the claim arose as a result of the debtor's failure to pay on the note. *Id.* at 12. In *Montgomery Ward,* as in *Motels of America,* the claim did not arise when the claimant was a shareholder and as a result of his status as a shareholder, but after the claimant had divested himself of all indicia of share ownership. When the claim arose, the claimant had only the expectation of a fixed recovery and had no expectation of sharing in the profits of the business or in suffering the consequences if

---

4. Even the efforts to reduce its risk did not, as F & W asserts, "guarantee" it payment of $6.2 million. At no time did IWCH agree to pay CCL $6.2 million; instead, it agreed to issue additional stock so that CCL's stock holdings at a specific discrete time (the con-summation of the IPO, sale of the stock by CCL, or after 18 months) had that value. But CCL, by holding stock, bore the risk that the value would not be maintained, as well as the possibility that it would increase. This is the essence of stock ownership.

the business were not successful. Therefore, at the time the claim arose, the claimant was a creditor, not a shareholder.

We find no discrepancy between our decision and *Montgomery Ward*. In *Montgomery Ward*, the claim was a claim for simple recovery on a debt instrument whereas this case involves a claim for breach of an agreement to issue more of the Debtor's stock. In this case, CCL (and, later, F & W) at all relevant times has been a shareholder of the Debtor. Unlike the claimants in *Motels of America* and *Montgomery Ward*, CCL did not, by executing the Supplement, divest itself of any of its rights as a shareholder; it still retained the right to share in any profits of IWCH. The Supplement is not, as suggested by F & W, a "debt" instrument. Here, the claim of F & W remains a claim for damages from the breach of an agreement to issue stock in the Debtor. Therefore, we hold that statutory subordination under section 510(b) is applicable.

### 4. *Post-petition breach v. pre-petition breach*

 Finally, F & W asserts that its claim is not subordinated under section 510(b) because the breach of the Supplement did not occur pre-petition. It relies on two cases decided under the Bankruptcy Act. *See, e.g., In re KDI Corporation,* 477 F.2d 726 (6th Cir.1973) (*"KDI I"*); *KDI Corporation v. Former Shareholders of Labtron of America,* 536 F.2d 1146 (6th Cir.1976) (*"KDI II"*). In *KDI I,* the issue before the Court of Appeals for the Sixth Circuit was whether the lower court had properly permitted the case to proceed under Chapter XI or whether it should have been converted to Chapter X. 477 F.2d at 728. In permitting the case to proceed under Chapter XI, the lower court had confirmed a plan of reorganization

which treated as creditors claimants who had contracts with the debtor which guaranteed the value of stock of the debtor issued to them. In affirming, the Sixth Circuit agreed that the contracts were debt instruments. 477 F.2d at 737. However, that issue was only ancillary to the ultimate decision to allow the case to proceed under Chapter XI rather than convert it to Chapter X.

In *KDI II,* the Court clarified its earlier ruling when it considered the priority of a claim under a contract for the issuance of stock of the debtor at a guaranteed value where the contract had been fully performed pre-bankruptcy except for the manual issuance of the stock. 536 F.2d at 1149. The Court concluded that the parties' rights under the contract had "matured" by the time the bankruptcy petition was filed, and therefore they were shareholders even though the stock had not been issued. *Id.*

F & W asserts that the *KDI* cases support its argument that it is a creditor, not a shareholder, of the Debtor. F & W asserts that the Supplement had not been fully performed as of the date the Debtors filed for bankruptcy and that, consequently, the contract is a debt instrument, not a security, and it is a creditor, not a shareholder, of IWCH.

We reject the argument of F & W because the *KDI* decisions are no longer good law in light of the passage of the Bankruptcy Code. To the extent that the *KDI* cases stand for the proposition that a claim for breach of a contract which guarantees the price of a security of the debtor is a general unsecured claim rather than a claim of a security holder, we conclude that those cases are no longer viable in light of section 510(b).[5]

---

5. The *KDI* cases were decided under the Bankruptcy Act, not the current Bankruptcy Code and, therefore, did not deal with the effect of section 510(b). According to Collier, this area of the law was unsettled under the Bankruptcy Act, with some courts holding

that a rescinding security holder of the debtor should be treated as a general unsecured creditor. Section 510(b) was enacted to reverse such authority and to automatically subordinate claims of rescinding shareholders to

In addition, section 365 of the Bankruptcy Code allows a debtor to reject an executory contract thereby converting the claim into a pre-petition claim. In this case, the Debtors' confirmed plan provided for the rejection of all executory contracts that had not been expressly assumed by the Debtors. Thus, the Supplement, to the extent it was still executory (as F & W asserts in attempting to fit into the *KDI II* scenario), was rejected by the Debtors. Pursuant to section 365(g) of the Code, F & W's rights are treated as if they fully matured the day before the petition was filed. Thus, even if the *KDI* decisions were still valid, F & W's claims (being fully matured pre-petition) would be shareholder claims under the *KDI II* decision.

## IV. CONCLUSION

For the foregoing reasons, we conclude that F & W's claim is one for damages arising from the purchase of stock of the Debtor. Consequently, it is subordinated to the claims of creditors pursuant to section 510(b).

the claims of the general unsecured creditors. 4 Collier on Bankruptcy at ¶ 510.04.