

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-15-2002

# In Re: Telegroup Inc

Precedential or Non-Precedential:

Docket 0-3823

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"In Re: Telegroup Inc" (2002). *2002 Decisions*. Paper 127.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/127

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 15, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3823

IN RE: TELEGROUP, INC.

BARODA HILL INVESTMENTS, LTD.; LEHERON
CORPORATION, LTD.; KIMBLE JOHN WINTER, Appellants

v.

TELEGROUP, INC.

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 00-cv-02730)
District Judge: Honorable Nicholas H. Politan

Argued: October 11, 2001

Before: BECKER, Chief Judge, SCIRICA and
GREENBERG, Circuit Judges.

(Filed February 15, 2002)

       J. BARRY COCOZIELLO, ESQUIRE
       ROBERT J. McGUIRE, ESQUIRE
        (ARGUED)
       Podvey, Sachs, Meanor, Catenacci,
       Hildner & Cocoziello
       One Riverfront Plaza
       Newark, NJ 07102

       Counsel for Appellants
       Baroda Hill Investments, Ltd.,
       LeHeron Corporation, Ltd., and
       Kimble John Winter

JAMES A. STEMPEL, ESQUIRE
JASON N. ZAKIA, ESQUIRE
 (ARGUED)
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Counsel for Appellee Telegroup, Inc.

OPINION OF THE COURT

BECKER, Chief Judge:

This bankruptcy appeal requires us to construe 11 U.S.C. S 510(b), which provides for the subordination of any claim for damages "arising from the purchase or sale" of a security of the debtor. The appeal arises out of a Chapter 11 Bankruptcy petition filed by appellee Telegroup, Inc. Appellants Baroda Hill Investments, Ltd., LeHeron Corporation, Ltd., and Kimble John Winter ("claimants" or "appellants") are shareholders of Telegroup who filed proofs of claim in the bankruptcy proceeding seeking damages for Telegroup's alleged breach of its agreement to use its best efforts to ensure that their stock was registered and freely tradeable. Claimants appeal from an order of the District Court affirming the Bankruptcy Court's order subordinating their claims against the bankruptcy estate pursuant to S 510(b).

Claimants argue that S 510(b) should be construed narrowly, so that only claims for actionable conduct-- typically some type of fraud or other illegality in the issuance of stock -- that occurred at the time of the purchase or sale of stock would be deemed to arise from that purchase or sale. Put differently, in claimants' submission, a claim must be predicated on illegality in the stock's issuance to be subordinated under S 510(b). Since the actionable conduct in this case (Telegroup's breach of contract) occurred after claimants' purchase of Telegroup's stock, claimants contend that the District Court erred in subordinating their claims.

2

Telegroup would read S 510(b) more broadly, so that claims for breach of a stock purchase agreement, which would not have arisen but for the purchase of Telegroup's stock, may arise from that purchase, even though the actionable conduct occurred after the transaction was completed. Telegroup further argues that subordinating appellants' claims advances the policies underlyingS 510(b) by preventing disappointed equity investors from recovering a portion of their investment in parity with bona fide creditors in a bankruptcy proceeding.

We agree with Telegroup, and hold that a claim for breach of a provision in a stock purchase agreement requiring the issuer to use its best efforts to register its stock and ensure that the stock is freely tradeable"arises from" the purchase of the stock for purposes ofS 510(b), and therefore must be subordinated. Accordingly, we will affirm.

I.

The relevant facts are undisputed, and can be succinctly summarized. Appellant LeHeron Corporation, Ltd. sold to Telegroup the assets of certain businesses that it owned in exchange for shares of Telegroup's common stock and a small amount of cash. As amended on June 5, 1998, the stock purchase agreements required Telegroup to use its best efforts to register its stock and ensure that the shares were freely tradeable by June 25, 1998. On February 10, 1999, Telegroup filed a voluntary Chapter 11 Bankruptcy petition, and on June 7, 1999, appellants filed proofs of claim against the bankruptcy estate alleging that Telegroup breached its agreement to use its best efforts to register its stock. Claimants sought damages on the theory that had Telegroup performed its obligation under the contract, they would have sold their shares as soon as Telegroup's stock became freely tradeable, thereby avoiding the losses incurred when Telegroup's stock subsequently declined in value.

Telegroup filed objections to these claims, asking the Bankruptcy Court to subordinate the claims pursuant to S 510(b), which provides that any claim for damages

3

"arising from the purchase or sale" of common stock shall have the same priority in the distribution of the estate's assets as common stock. The Bankruptcy Court filed a written opinion and order subordinating appellants' claims, holding that because appellants' claims would not exist but for their purchase of Telegroup's stock, the claims arise from that purchase for purposes of S 510(b). The District Court affirmed, and claimants filed this appeal.

The District Court had jurisdiction pursuant to 28 U.S.C. S 158(a), and we have jurisdiction pursuant to 28 U.S.C. S 158(d). Because the District Court sat below as an appellate court, this Court conducts the same review of the Bankruptcy Court's order as did the District Court. See In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999). As the relevant facts are undisputed, this appeal presents a pure question of law, which we review de novo. See id.

II.

A.

Section 510(b) of the Bankruptcy Code provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

In this case, the question is whether appellants' breach of contract claim is "a claim . . . for damages arising from the purchase or sale of . . . a security [of the debtor]." Id. Claimants concede that the securities that they purchased from Telegroup are common stock. Therefore, if their claims "arise from" the purchase of that stock, then under S 510(b) their claims would have the same priority as common

4

stock, and would be subordinated to the claims of general unsecured creditors.

The question of the scope of S 510(b) presents this Court with a matter of first impression. Those courts that have considered the issue appear divided on how broadly the phrase "arising from the purchase or sale of . . . a security" should be construed. Compare, e.g., In re Amarex, Inc., 78 B.R. 605, 610 (W.D. Okla. 1987) (holding that under S 510(b), a claim does not arise from the purchase or sale of a security if it is predicated on conduct that occurred after the security's issuance), with In re NAL Fin. Group, Inc., 237 B.R. 225 (Bankr. S.D. Fla. 1999) (holding that claims for breach of the debtor's agreement to use its best efforts to register its securities arise from the purchase of those securities, for purposes of S 510(b)).

In construing S 510(b), we begin, as we must, with the text of the statute. See Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) ("[The] first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."). The inquiry "must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." Id. (internal quotation marks and citations omitted).

Claimants argue that their claims do not arise from the purchase or sale of Telegroup's common stock because a claim "aris[es] from the purchase or sale of . . . a security" only if the claim alleges that the purchase or sale of the security was itself unlawful. According to claimants, a claim does not arise from the purchase or sale of a security if it is predicated on conduct that occurred after the purchase or sale. See In re Amarex, Inc., 78 B.R. 605, 610 (W.D. Okla. 1987) (holding that a claim for breach of a partnership agreement, because it is based on conduct that occurred after the issuance and sale of the partnership units, does not arise from the purchase or sale of those units); In re Angeles Corp., 177 B.R. 920, 926 (Bankr. C.D. Cal. 1995) (holding that claims for breach of fiduciary duty do not arise from the purchase or sale of limited partnership interests where the wrongful conduct occurred after the sale of those interests); see also In re Montgomery

5

Ward Holding Corp., No. 97-1409, 2001 Bankr. LEXIS 158 at *20 (Bankr. D. Del. Jan. 16, 2001) (holding that a claim arises from the purchase or sale of a security only if there is "an allegation of fraud in the purchase, sale or issuance of the . . . instrument"). Since the actionable conduct in this case includes Telegroup's alleged post-sale breach of contract, in claimants' submission the claim does not arise from the purchase or sale of debtor's stock, and therefore should not be subordinated under S 510(b).

Telegroup responds that claims arising from the purchase or sale of a security under S 510(b) include claims predicated on post-issuance conduct. See In re Geneva Steel Co., 260 B.R. 517 (B.A.P. 10th Cir. 2001) (holding that claims alleging that the debtor fraudulently induced the claimants to retain securities they had purchased from the debtor arise from the purchase or sale of those securities, for purposes of S 510(b)); In re Granite Partners, L.P., 208 B.R. 332, 333-34 (Bankr. S.D.N.Y. 1997) (holding that claims that debtor fraudulently induced claimants to retain debtor's securities arise from the purchase or sale of those securities); see also In re Lenco, Inc., 116 B.R. 141 (Bankr. E.D. Mo. 1990) (holding that claims for ERISA violations arose from the purchase or sale of debtor's securities).

Telegroup contends that appellants' claims "arise from" the purchase or sale of Telegroup's common stock because they allege a breach of the purchase agreement whereby claimants acquired shares of Telegroup stock, which required Telegroup to use its best efforts to register its stock. See In re NAL Fin. Group, Inc., 237 B.R. 225 (Bankr. S.D. Fla. 1999) (holding that claims for breach of debtor's agreement to use its best efforts to register its securities arise from the purchase of those securities, for purposes of S 510(b)); see also In re Betacom of Phoenix, Inc., 240 F.3d 823 (9th Cir. 2001) (holding that a claim for breach of a provision in a merger agreement arises from the purchase or sale of the debtor's securities); In re Int'l Wireless Communications Holdings, Inc., 257 B.R. 739, 746 (Bankr. D. Del. 2001) (disapproving Angeles and Amarex, supra, and holding that claims against the debtor for breach of a supplement to a share purchase agreement arise from the purchase or sale of those securities); In re Kaiser Group

Int'l, Inc., 260 B.R. 684 (Bankr. D. Del. 2001) (holding that claims for breach of a merger agreement arise from the purchase or sale of debtor's securities). Therefore, in Telegroup's submission, the Bankruptcy Court correctly subordinated appellants' claims pursuant to S 510(b).

We conclude that the phrase "arising from" is ambiguous. For a claim to "aris[e] from the purchase or sale of . . . a security," there must obviously be some nexus or causal relationship between the claim and the sale of the security, but S 510(b)'s language alone provides little guidance in delineating the precise scope of the required nexus. On the one hand, it is reasonable, as a textual matter, to hold that the claims in this case do not "arise from" the purchase or sale of Telegroup's stock, since the claims are predicated on conduct that occurred after the stock was purchased. On the other hand, it is, in our view, more natural, as a textual matter, to read "arising from" as requiring some nexus or causal relationship between the claims and the purchase of the securities, but not as limiting the nexus to claims alleging illegality in the purchase itself. In particular, the text of S 510(b) is reasonably read to encompass the claims in this case, since the claims would not have arisen but for the purchase of Telegroup's stock and allege a breach of a provision of the stock purchase agreement.

Although we believe that Telegroup's reading of S 510(b) is the more comfortable reading of the provision as a textual matter, we acknowledge that the language "arising from" is nonetheless susceptible to claimants' construction. Because the text of S 510(b) is ambiguous as applied to the claims in this case, we turn to the provision's legislative history and the policies underlying the provision, to determine whether the claims "arise from" the purchase of Telegroup's stock, and therefore must be subordinated.

B.

Both the House Report on the 1978 Bankruptcy Revisions and the Report of the Commission on Bankruptcy Laws, whose proposed legislation was largely adopted by the 1978 enactment of the Bankruptcy Code, suggest that in enacting S 510(b), Congress was focusing on claims

7

alleging fraud or other violations of securities laws in the issuance of the debtor's securities. See Report of the Committee on the Judiciary, Bankruptcy Law Revision, H.R. Rep. No. 95-595, at 194 (1977) ("A difficult policy question to be resolved in a business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a purchase: Should he be treated as a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated?"); Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pt. 2, at 116 (1973) (commenting that the proposed provision "subordinates claims by holders of securities of a debtor corporation that are based on federal and state securities legislation, rules pursuant thereto, and similar laws").

In enacting S 510(b), Congress relied heavily on a law review article written by Professors John J. Slain and Homer Kripke, The Interface Between Securities Regulation and Bankruptcy -- Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors, 48 N.Y.U. L. Rev. 261 (1973). See H.R. Rep. No. 95-595, at 196 (summarizing the argument in the Slain/Kripke article and stating that "[t]he bill generally adopts the Slain/Kripke position"); id. at 194 ("The argument for mandatory subordination is best described by Professors Slain and Kripke."); In re Betacom of Phoenix, Inc., 240 F.3d 823, 829 (9th Cir. 2001) ("Congress relied heavily on the analysis of two law professors in crafting the statute."); In re Granite Partners, L.P., 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997) ("Any discussion of section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke . . . .").

Slain and Kripke argued that claims of shareholders alleging fraud or other illegality in the issuance of stock should generally be subordinated to the claims of general unsecured creditors, conceptualizing the issue as one of risk allocation. See generally Elizabeth Warren, Bankruptcy Policy, 54 U. Chi. L. Rev. 775, 777 (1987) ("[B]ankruptcy policy becomes a composite of factors that bear on a better answer to the question, `How shall the losses be

distributed?' "). Slain and Kripke argued that"[t]he situation with which we are concerned involves two risks: (1) the risk of business insolvency from whatever cause; and (2) the risk of illegality in securities issuance." Slain & Kripke, supra, at 286.

Analyzing the first risk -- that of business insolvency -- Slain and Kripke observed that the absolute priority rule allocates this risk to shareholders. Under the absolute priority rule, "stockholders seeking to recover their investments cannot be paid before provable creditor claims have been satisfied in full." Id. at 261; see generally Consol. Rock Prods. Co. v. Dubois, 312 U.S. 510, 520-21 (1941) (holding that stockholders cannot participate in a plan of reorganization unless creditors' claims have been satisfied in full); Case v. Los Angeles Lumber Prods. Co. , 308 U.S. 106 (1939) (same); see also Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 436 n.2 (1972) (Douglas, J., dissenting) (discussing the history of the absolute priority rule).

The rationale for the absolute priority rule rests on the different risk-return packages purchased by stockholders and general creditors:

> In theory, the general creditor asserts a fixed dollar claim and leaves the variable profit to the stockholder; the stockholder takes the profit and provides a cushion of security for payment of the lender's fixed dollar claim. The absolute priority rule reflects the different degree to which each party assumes a risk of enterprise insolvency . . . .

Slain & Kripke, supra, at 286-87; see also Warren, supra, at 792 ("An almost axiomatic principle of business law is that, because equity owners stand to gain the most when a business succeeds, they should absorb the costs of the business's collapse -- up to the full amount of their investment."). Thus, argued Slain and Kripke, the absolute priority rule allocates to stockholders the risk of business insolvency, and "no obvious reason exists for reallocating that risk." Slain & Kripke, supra, at 287.

Analyzing the second risk -- the risk of illegality in the issuance of stock -- Slain and Kripke argued that this risk,

9

too, should be born by shareholders. "It is difficult to conceive of any reason for shifting even a small portion of the risk of illegality from the stockholder, since it is to the stockholder, and not to the creditor, that the stock is offered." Id. at 288. Slain and Kripke therefore concluded that shareholder claims alleging illegality in the issuance of stock should be subordinated to the claims of general unsecured creditors.

The focus of the Slain/Kripke article suggests that Congress considered claims alleging fraud or other illegality in the issuance of securities to be at the core of claims that "aris[e] from the purchase or sale of . . . a security" for purposes of S 510(b). See Slain & Kripke, supra, at 267 ("For present purposes it suffices to say that when the basis of the stockholder's disaffection is either the issuer's failure to comply with registration requirements or the issuer's material misrepresentations, one or more state or federal claims may be made."). Indeed, the title of their article –– "The Interface Between Securities Regulation and Bankruptcy –– Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors" –– indicates that Slain and Kripke were primarily concerned with actionable conduct occurring in the issuance of the debtor's securities, as opposed to post-issuance conduct.

This focus in the legislative history on fraud or other illegality in the securities' issuance supports claimants' argument that their claims do not arise from the purchase or sale of Telegroup's stock because the actionable conduct (the breach of Telegroup's agreement to use its best efforts to register its stock) occurred after the sale was completed, and did not involve any fraud or violation of securities laws in the issuance itself. Although we thus agree with claimants that claims alleging illegality in the issuance of securities fall squarely within the intended scope of S 510(b), we cannot find anything in the legislative history indicating that Congress intended to limit the scope of S 510(b) to only such claims. In fact, Slain and Kripke explicitly declined to delineate the exact boundary between those shareholder claims that should be subordinated and those that should not. See Slain & Kripke, supra, at 267

10

("We are only incidentally concerned with the precise predicate of a disaffected stockholder's efforts to recapture his investment from the corporation."). We therefore read the specific types of claims referred to in the legislative history as "arising from" the purchase or sale of a security as illustrative, not exhaustive, examples of claims that must be subordinated pursuant to S 510(b).

While the legislative history fails to define explicitly the intended scope of S 510(b), the legislative history, by adopting the Slain/Kripke argument, sheds light on the policies animating S 510(b), which provide guidance in deciding whether the claims in this case arise from the purchase of Telegroup's stock. Ultimately, the Slain and Kripke proposal that inspired S 510(b) appears intended to prevent disappointed shareholders from recovering the value of their investment by filing bankruptcy claims predicated on the issuer's unlawful conduct at the time of issuance, when the shareholders assumed the risk of business failure by investing in equity rather than debt instruments. See Slain & Kripke, supra , at 267 (framing the problem in terms of "a disaffected stockholder's efforts to recapture his investment from the corporation"); id. at 261 ("In these cases, a dissatisfied investor may rescind his purchase of stock or subordinated debt by proving that the transaction violated federal or state securities laws."); id. at 268 ("[I]nvestors in stock or in subordinated debentures may be able to bootstrap their way to parity with, or preference over, general creditors even in the absence of express contractual rights.").

Section 510(b) thus represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy. See H.R. Doc. No. 93-137, pt. 1, at 22 (1973) (recommending "that claims by stockholders of a corporate debtor for rescission or damages, which if allowed will promote them to the status of creditors, be subordinated to the claims of the real creditors"). With these policies in mind, we now turn to the application of S 510(b) to the claims at issue in this case.

11

C.

1.

Claimants' reading of S 510(b) as requiring the
subordination of only those claims alleging fraud or
actionable conduct in the issuance not only is plausible as
a textual matter, see supra Section II.A, but also has some
appeal at an abstract level, as noted in the margin. 1
Nonetheless, the distinction that claimants' reading of
S 510(b) draws between actionable conduct that occurred at
the time of the purchase of the security and actionable
conduct that occurred after the purchase seems to us to
lack any meaningful basis as a matter of Congressional
policy, and therefore provides an inadequate resolution of
the ambiguity in the text of S 510(b) as applied to the
claims in this case. As discussed above, Congress enacted
S 510(b) to prevent disappointed shareholders from

_____

1. Because appellants' claims are for breach of a contractual provision
intended to limit their investment risk, their claims are arguably
analogous to unsecured creditors' claims on promissory notes, and
therefore should enjoy the same priority. In both cases, the claims are
for breach of a contractual provision -- in the case of claimants suing on
a promissory note, the contractual provision requires the debtor to repay
the loan, and in this case, the contractual provision requires the debtor
to use its best efforts to register its stock. In both cases the
contractual
provision limits the claimants' investment risk-- in the case of a
promissory note, the contractual provision ensures that noteholders will
be paid before any profits are distributed to shareholders, and in this
case, the contractual provision ensures that stockholders can sell their
stock if the corporation begins to fail, thereby recovering at least a
portion of their investment.

Moreover, in both cases, the contractual provision limiting the
investment risk is acquired in exchange for a lower rate of return -- in
the case of noteholders, the promissory note provides only a fixed rate of
return, and in this case, the issuer's agreement to use its best efforts
to
register its stock presumably increased the price claimants paid for the
stock, thereby decreasing their expected return. This analogy between
the claims of unsecured creditors suing on promissory notes and the
claims of shareholders suing for breach of the issuer's agreement to use
its best efforts to register its stock therefore suggests that appellants'
claims should not be subordinated under S 510(b), and should be given
the same priority as the claims of general unsecured creditors.

12

recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding. Nothing in this rationale would distinguish those shareholder claims predicated on post-issuance conduct from those shareholder claims predicated on conduct that occurred during the issuance itself. Cf. In re Granite Partners, L.P., 208 B.R. 332, 342 (Bankr. S.D.N.Y. 1997) ("[T]here is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and post-investment fraud that adversely affects the ability to sell (or hold) the investment; both are investment risks that the investors have assumed.").

More important than the timing of the actionable conduct, from a policy standpoint, is the fact that the claims in this case seek to recover a portion of claimants' equity investment. In enacting S 510(b), Congress intended to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy. Since claimants in this case are equity investors seeking compensation for a decline in the value of Telegroup's stock, we believe that the policies underlying S 510(b) require resolving the textual ambiguity in favor of subordinating their claims. Put differently, because claimants retained the right to participate in corporate profits if Telegroup succeeded, we believe that S 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors. Were we to rule in claimants' favor in this case, we would allow stockholders in claimants' position to retain their stock and share in the corporation's profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors if the corporation fails.

Claimants argue that they never intended to retain their equity investment and share in Telegroup's profits, and submitted affidavits asserting that they intended to liquidate their shares as soon as Telegroup registered its stock and the stock became publicly tradeable. See Appellants' Brief at 26 ("The Claimants had no desire to become long-term investors in the Debtor. They accepted

the shares as a cash substitute and intended immediately to sell those shares once the shares were registered.").

We have difficulty believing that if Telegroup's business prospects had suddenly improved and its profits had gone through the roof, claimants would nonetheless have liquidated their shares as soon as they became publicly tradeable. No profit-maximizing shareholder would liquidate her shares if the shareholder believed the expected return would exceed the shares' market value. Indeed, had claimants intended to liquidate their shares as soon as possible, they would have filed breach of contract claims immediately on June 25, 1998, when the contract was initially breached, rather than waiting until June 7, 1999, nearly a year later, to file their claims. Furthermore, if as claimants now contend, they never intended to assume any of the investment risks of equity-holders, it is unclear why they did not purchase non-equity securities with a fixed rate of return. The fact that claimants chose to invest in equity rather than debt instruments suggests that they preferred to retain the right to participate in profits, and with it, the risk of losing their investment if the business failed.

To be sure, it could be argued that this analysis does not warrant subordinating appellants' claims because the claims seek compensation for a risk that appellants did not assume. In particular, although claimants, as equity investors, assumed the risk of business failure, they did not assume the risk that Telegroup's stock would not be publicly tradeable, since they allocated that risk by contract to Telegroup. This objection to subordinating appellants' claims, however, proves too much, as it would apply equally to shareholders' claims for fraud in the issuance. Although shareholders do not assume risks that are fraudulently concealed from them, shareholder claims alleging fraud in the issuance nonetheless fall squarely within the intended scope of S 510(b). See supra Section II.B.

2.

A comparison of appellants' claims with claims for fraud or other illegality in the issuance of the debtor's securities,

14

which appellants concede must be subordinated pursuant to S 510(b), further supports the subordination of appellants' claims. The policy considerations underlying the Congressional judgment in S 510(b) that those who purchase the debtor's stock, rather than general unsecured creditors, should bear the risk of loss caused by illegality in the issuance of the stock, seem to us to apply equally to the claims in this case. In both cases, the claim would not exist but for claimants' purchase of debtor's stock. In both cases, the claim seeks compensation for a decline in the stock's value caused by actionable conduct on the debtor's part. And in both cases, because the stockholder, as an equity investor, assumed the risk of business failure, the stockholder must bear the risk, in the event of bankruptcy, of any unlawful conduct on the debtor's part that causes the stock's value to drop.

That the same policy considerations applicable to claims alleging fraud in the issuance of securities apply with equal force here is illustrated by considering a hypothetical case in which Telegroup did not contractually agree to use its best efforts to register its stock, but instead misrepresented to buyers at the time of the purchase that Telegroup was currently using its best efforts to register the stock. In such a case, the stockholders' fraud claims against Telegroup would clearly arise from the purchase of Telegroup's stock, and therefore would be subordinated pursuant toS 510(b). The only difference between that hypothetical and this case is that here, instead of fraudulently misrepresenting to buyers that it was using its best efforts to register its stock, Telegroup breached its contractual obligation to use its best efforts to register its stock.

Given that the text of S 510(b) may be reasonably read to apply to both claims alleging fraud in the issuance and the claims in this case, see supra Section II.A, we see no reason as a matter of policy why a fraud claim against Telegroup for misrepresenting to buyers that it was using its best efforts to register its stock should be subordinated under S 510(b), but a contract claim against Telegroup for breaching its agreement to use its best efforts to register its stock should not. See In re Int'l Wireless Communications Holdings, Inc., 257 B.R. 739, 746 (Bankr. D. Del. 2001)

15

("Many claims of `defrauded' shareholders could be characterized as either [contract or tort claims]. Were we to limit the applicability of section 510(b) to tort claims, shareholders could easily avoid its effect by asserting that a debtor's fraudulent conduct in the sale of its securities was a breach of the sales contract."); In re NAL Fin. Group, Inc., 237 B.R. 225, 232 (Bankr. S.D. Fla. 1999) ("[T]he subsequent [breach of contract] is no different than a fraud committed during the purchase for purposes of determining whether [a claim] . . . should be subordinated under S 510(b)."). See generally In re Betacom of Phoenix, Inc., 240 F.3d 823, 829 (9th Cir. 2001) ("There is nothing in the Slain and Kripke analysis to suggest that Congress's concern with creditor expectations and equitable risk allocation was limited to cases of debtor fraud."); In re Pub. Serv. Co. of N.H., 129 B.R. 3, 5 (Bankr. D.N.H. 1991) ("Although the claim in this case is largely based on fraud, the language of 510(b) is broad enough to include breach of contract and related actions as well.").

III.

For the foregoing reasons, we hold that a claim for a breach of a provision in a stock purchase agreement requiring the issuer to use its best efforts to register its stock arises from the purchase or sale of the stock, and therefore must be subordinated pursuant to S 510(b).2 Accordingly, the order of the District Court will be affirmed.

_____

2. Claimants argue that to subordinate their claims in this case "renders most of the language of S 510(b) superfluous," since it would mean that "any claim by an equity holder should be subordinated." Appellants' Reply Br. at 4. In particular, claimants rely on In re Angeles Corp., 177 B.R. 920 (Bankr. C.D. Cal. 1995), which stated that:

If Congress had wanted to subordinate all claims of security holders
to an equity position, regardless of the source of the claim, Congress
would have worded Section 510(b) to say: "All claims made by security holders, regardless of the source of the claim, shall be subordinated to an equity class . . ." However, Bankruptcy Code Section 510(b) does not say this. Thus, Section 510(b)'s subordination of claims "arising from the sale or purchase of a security" must mean subordinating less than every claim of a security holder, regardless of how that claim arises.

16

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

Id. at 927. We agree that in enacting S 510(b), Congress did not intend
        to subordinate every claim brought by a shareholder, regardless of
the
        nature of the claim. We disagree with claimants, however, that the
        subordination of all claims brought by shareholders is a logical
        consequence of our holding that claims for the breach of a stock
        purchase agreement requiring the issuer to use its best efforts to
register
        its stock must be subordinated pursuant to S 510(b). Nothing in our
        rationale would require the subordination of a claim simply because
the
        identity of the claimant happens to be a shareholder, where the
claim
        lacks any causal relationship to the purchase or sale of stock and
when
        subordinating the claims would not further the policies underlying
        S 510(b), which was intended to prevent shareholders from
recovering
        their equity investment in parity with general unsecured creditors.

17