**In re RESPONSE U.S.A., INC., et al., Debtors.**

**Andrew Queen, et al., Appellants,**

**v.**

**Official Committee of Unsecured Creditors, et al., Appellees.**

Civil Nos. 02–4975(JBS), 02–5283(JBS).

United States District Court, D. New Jersey.

Jan. 27, 2003.

 

Lester M. Kirshenbaum, Kaye Scholer, LLP, New York City, for Keybank National Association.

Michael A. Zindler, Teich, Groh, Frost & Zindler, Mercerville, NJ, for Morton C. Batt, Chapter 11 Trustee.

## OPINION

SIMANDLE, District Judge.

In September 1998, Andrew Queen, Jeffrey Queen, and Lorence Queen as Trustee for the Jeffrey Queen and Andrew Queen Irrevocable Trust U/A January 2, 1998 (the "Queen parties")[1] sold to Response U.S.A., Inc. ("Response") all of the issued and outstanding stock of HealthWatch, Inc. in exchange for a combination of cash and Response common stock. The Stock Purchase Agreement included a provision to protect the Queen parties if the Response stock declined in value. Generally, if the stock price declined in the first five years the Queens owned the Response stock and the Queen parties sold the stock, Response would pay the Queens the difference between the purchase price and the sale price in stock or cash; in two carefully defined situations, Response would have to pay the difference in cash.

The Queen parties filed the three proofs of claim that are at issue in this matter, numbers 47, 48, and 49, seeking cash compensation in accordance with this provision in the Stock Purchase Agreement for the decline in value of their Response stock because of the bankruptcy filing. On October 3, 2002, the Honorable Gloria Burns, United States Bankruptcy Judge, held that the three claims must be subordinated to all claims or interests senior to the interests represented by the shares of Response common stock in accordance with

Edward L. Paul, Sklar & Paul, P.C., Voorhees, NJ, Jeffrey M. Herman (Argued), Stuart S. Mermelstein, Herman & Mermelstein, P.A., Hollywood, FL, for Andrew Queen, Zenex A1, L.L.C., The Jeffrey and Andrew Queen Irrevocable Trust U/A January 2, 1998, Lorence Queen as Trustee for the Jeffrey and Andrew Queen Irrevocable Trust U/A January 2, 1998, Jeffrey Queen, and Zenex J1, L.L.C.

Daniel D. Haggerty, Weir & Partners, LLP, Turnersville, NJ, Kenneth E. Aaron (Argued), Weir & Partners, LLP, Philadelphia, PA, for Official Committee of Unsecured Creditors as Intervening Plaintiff.

---

1. Also included as "Queen parties" to this appeal are two limited liability corporations created by the Queens, Zenex A1, L.L.C., and Zenex J1, L.L.C.

11 U.S.C. § 510(b) which requires such subordination if claims are "for damages arising from the purchase or sale of . . . a security."

The Queen parties filed a timely notice of appeal of the October 3rd Order, oral argument was heard January 2, 2003, and this Court must determine whether the Queen parties' claims based on the protection included in the Stock Purchase Agreement are claims "for damages arising from the purchase or sale of . . . a security." For the following reasons, this Court finds that they are and must be subordinated pursuant section 510(b). Therefore, this Court will affirm Judge Burns' October 3, 2002 order.

## I. BACKGROUND

The "Queen parties," namely Andrew Queen, Jeffrey Queen, Lorence Queen as Trustee for the Jeffrey Queen and Andrew Queen Irrevocable Trust U/A January 2, 1998, Zenex A1, L.L.C., and Zenex J1, L.L.C., submitted proofs of claim numbers 47, 48, and 49 for payment from the debtor, Response, Inc.'s bankruptcy estate.[2] Each proof of claim is for $1,064,950.

The three proofs of claim assert rights to payment under section 2.6[3] of a Sep-

---

**2.** Proof of claim number 47 was filed by Andrew Queen individually and on behalf of Zenex A1, L.L.C.; number 48 was filed by Lorence Queen as Trustee of the Jeffrey Queen and Andrew Queen Irrevocable Trust u/a dated January 2, 1998; number 49 was filed by Jeffrey Queen individually and on behalf of Zenex A1, L.L.C. (Appellant Br. at 4.)

**3.** Section 2.6 of the Stock Purchase Agreement provides:

**2.6 Response Stock Make–Up**
**a. Sale of Initial Response Stock.** If, on the date (the "Make-up Date") which is the earlier of (a) 9 months from the Closing Date or (b) the date on which the Stockholders have sold at least seventy-five percent (75%) of the Registered Stock owned by them in the aggregate, the Stockholders have sold such shares of Registered Stock and have received net proceeds (i.e. after deducting reasonable sales expenses (including but not limited to commissions and the cost of any legal opinions in connection with the transfer)), of less than the Original Value of the shares sold (as determined under Section 2.5 when the Stockholder received such shares), Buyer must pay the Stockholder the difference. Buyer may elect to pay the difference either by delivering cash or Registered Stock (sometimes referred to as "Make–Up Stock") to the Stockholder. If Buyer pays with Make–Up Stock, such stock must be valued in accordance with Section 2.5 herein, for determining how many shares Buyer must pay to the Stockholder. Buyer must make the payment of cash or Make–Up Stock, as applicable, within 10 days of the applicable Make–Up Date for such sale. Buy-

er's obligation to make up the difference is effective for only sales a Stockholder makes within 5 years of receiving the Response Stock subject to such sale provided however, that, notwithstanding anything to the contrary contained in this Agreement, if during the period between the last Make–Up Date prior to the end of such 5 year period and the end of such 5 year period, any Stockholder has sold any Response Stock and has received less than the Original Value for such shares, Buyer must pay the difference to such Stockholder in cash and not in Make–Up Stock. If, on the date which is 9 months following the Make–Up Date and on each date which is 9 months following such date (each such date also referred to as the "Make–Up Date"), any Stockholder has sold Response Stock during such 9 month period and has received net proceeds (i.e. after deducting reasonable sales expenses (including but not limited to commissions and the cost of any legal opinions in connection with the transfer)) of less than the Original Value of the shares sold (as determined under Section 2.5 when the Stockholder received such shares), during such 9–month period Buyer must pay the Stockholder the difference. Buyer may elect to pay the difference either by delivering cash or Make–Up Stock. Buyer must make the payment of cash or Make–Up Stock, as applicable, within 10 days of the applicable Make–Up Date for such sale. Buyer's obligation to make up the difference is effective for only sales a Stockholder makes within 5 years of receiving the Response Stock subject to such sale provided however, that, notwithstanding anything to the contrary contained in this Agreement, if

tember 16, 1998 Stock Purchase Agreement as amended by January 11, 2000 and July 19, 2000 settlement agreements.[4] With the September 1998 Stock Purchase Agreement, the Queen parties agreed to sell all of the issued and outstanding stock of HealthWatch, Inc. to Response in exchange for a combination of cash and Response common stock. Section 2.6 of the Agreement provided protection for the Queen parties. Under this section, Response assured the value of the payment shares for a five-year period by agreeing to pay the Queen parties on set "Make–Up dates" the difference between the assured value and the actual sales price for any shares that were sold during the Make–Up period. Generally, Response could pay the difference in stock or in cash; in two situations, it was required to pay the difference in cash.

This appeal relates only to the shares of stock that the Stockholders held on the date of Response's bankruptcy filing, namely, 228,378 payment shares, 1,227,969 shares issued pursuant to the January 11, 2000 settlement agreement, and 3,705,382 shares issued pursuant to the July 19, 2000 amendment to the Settlement Agreement (referred to as "Amendment No. 1").[5] The Queen parties filed the three proofs of claim based on these holdings, claiming that they have a right to $3,194,850 under Section 2.6 of the Stock Purchase Agreement because the stock declined in value when Response filed bankruptcy. Andrew Queen, in an Affidavit, explained that the Response stock was "rendered worthless with no market at the time of the filing of the voluntary Chapter 11 cases on August 30, 2001."[6] (Record on Appeal, Item 8, Ex. 1, ¶ 13.)

The Official Committee of Unsecured Creditors and Trustee Morton Batt filed a motion for summary judgment on September 5, 2002, seeking subordination of the Queen parties' claims 47, 48, and 49 pursuant to section 510(b) of the Bankruptcy Code which requires subordination of claims "for damages arising from the pur-

during the period between the last Make–Up Date prior to the end of such 5 year period and the end of such 5 year period, any Stockholder has sold any Response Stock and has received less than the Original Value for such shares, Buyer must pay the difference to such Stockholder in cash and not in Make–Up Stock. For any Make–Up Date occurring after the date the Stockholders have sold at least 90% of the shares of Response Stock that they received at Closing, in the aggregate, notwithstanding anything to the contrary, Buyer must pay the difference then owed to the Stockholder from the sale of any remaining shares of Response Stock paid at Closing or received as Make–Up Stock (excluding shares of stock received as payment for the Deferred Purchase Price) from such sales, in the form of cash and not Make–Up Stock.

4. The two settlement agreements do not affect the basic issue presented here. Section 2(a) of the January 11, 2000 settlement agreement amended Section 2.6 of the Stock Purchase

Agreement to extend the July 10, 2000 "Make–Up" date. Amendment No. 1 of the July 19, 2000 settlement agreement provided that 3,705,382 shares of Response common stock issued to the Queens parties on that date would "represent[ ] payment in full of all Make–Up Stock otherwise payable to the Stockholders on July 10, 2000 pursuant to Section 2(a) of the Settlement Agreement."

5. The Appellees dispute whether the Queen parties are entitled to protection under section 2.6 for the 3,705,382 shares of Response stock issued pursuant to Amendment No. 1. The issue was not addressed on this motion for summary judgment and will not be addressed here. (*See* Record on Appeal, Item 7 at 21.)

6. Andrew Queen also argues that even if filing date did not trigger the right to compensation, the right was triggered by their May 2, 2002 sale of all the Queen shares of Response stock for $3,300. (Record on Appeal, Item 8, Ex. 1, ¶¶ 11–12.)

chase or sale of a . . . security." (Record on Appeal, Item 7.) On October 1, 2002, the Honorable Gloria Burns heard oral argument on the motion. (Record on Appeal at 2.) She considered the Queen parties' argument that their claims should not be subordinated because they are seeking a payment of cash entitled to them by the stock purchase agreement, instead of "damages" for breach of the stock purchase agreement, and stated:

> It seems to me when there's a breach of contract the result that you claim is damages. And call it anything that you want, money, cash, whether—whatever it ends up being, the money that's being claimed, the amount of their claim is based on an alleged breach of contract for payment under this stock purchase agreement and the subsequent amendments to it.
>
> So I believe that—the language of damages in the statute comes within this, and looking at the entire picture, and the analysis that the Circuit [in *Telegroup* ] goes through, in why they think that 510(b) should be appropriate, in the broader sense, looking at what Congress's intention was, this Court believes that those things are all—all within this case.

(Appellant's Br. at 17.) On October 3, 2002, Judge Burns issued an Order granting summary judgment which states, in pertinent part:

> IT IS, on this 3rd day of October, 2002, ORDERED as follows:
>
> 1. Plaintiff's Motion for Summary Judgment be and hereby is GRANTED in favor of Plaintiffs and against the Defendants.
>
> 2. Proofs of Claim Nos. 47, 48, and 49 be and hereby are subordinated in accordance with 11 U.S.C. § 510(b) to all

claims or interests that are senior to the interest represented by the shares of common stock of Response U.S.A., Inc.

(10/3/02 Bankruptcy Order at 2.) The Queen parties filed their Notice of Appeal of the October 3, 2002 Bankruptcy Order on October 11, 2002. This Court heard oral argument on January 2, 2003.

## II. DISCUSSION

### A. Standard of Review

 This Court has jurisdiction to review the order of the bankruptcy court pursuant to 28 U.S.C. § 158(a). The district court must review the bankruptcy court's findings of fact for clear error, its conclusions of law *de novo*, and its exercises of discretion for abuse of discretion. *See In re Top Grade Sausage, Inc.,* 227 F.3d 123, 125 (3d Cir.2000); *In re O'Brien Envtl. Energy, Inc.,* 188 F.3d 116, 122 (3d Cir.1999); *Meridian Bank v. Alten,* 958 F.2d 1226, 1229 (3d Cir.1992). In reviewing factual findings, the district court must "give due regard to the opportunity of [the bankruptcy] court to judge, first-hand, the credibility of the witnesses." *In re Rosen,* 208 B.R. 345, 348 (D.N.J.1997) (quoting *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.,* 57 F.3d 1215, 1223 (3d Cir.1995)). A bankruptcy court only abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts. *See O'Brien,* 188 F.3d at 122.

### B. Analysis

 The Queen parties argue that their claims should not have been subordinated pursuant to 11 U.S.C. § 510(b) because they are not claims for "damages arising from the purchase or sale of a . . . security." [7] Instead, they argue that the claims

---

7. Section 510(b) of the Bankruptcy Code provides:

are based on a contractual right to payment which finds its basis in the Stock Purchase Agreement. The Official Committee of Unsecured Creditors argues that the Queens' claims based on the Stock Purchase Agreement are claims that fit within section 510(b) because they assert breach of contract "damages" suffered because Response did not pay them according to the terms of the Stock Purchase Agreement.

■ In 2002, the Third Circuit made clear that for purposes of section 510(b), a claim arises from the purchase or sale of a security if there is "some nexus or causal relationship between the claims and the purchase of the securities." *In re Telegroup, Inc.,* 281 F.3d 133, 138 (3d Cir. 2002). The claim does not need to allege that there was illegality in the purchase of the securities as long as the "claims would not have arisen but for the purchase of [the] stock." *Id.* Therefore, the Third Circuit found that a claim based on an alleged breach of a provision of the stock purchase agreement should be subordinated pursuant to section 510(b).[8]

Section 510(b) "represents a Congressional judgment that, as between share-holders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy." *Id.* at 141. Those who purchase the debtor's stock, rather than the general unsecured creditors, bear the risk of loss because when they purchased the stock, they assumed the risk that the business would fail. *Id.* at 143. The Third Circuit explained that:

> were we to rule in claimants' favor in this case, we would allow stockholders in claimants' position to retain their stock and share in the corporation's profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors if the corporation fails.

*Id.* at 142. Section 510(b) prevents this result. The very fact that a claimant invested in equity rather than debt instruments "suggests that they preferred to retain the right to participate in profits, and with it, the risk of losing their investment if the business failed." *Id.* Therefore, section 510(b) places the risk that the company may declare bankruptcy on the shareholder by subordinating its claims to those of the general unsecured creditors. *Id.* at 141.

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

8. In *Telegroup,* shareholders had filed proofs of claim in the bankruptcy proceeding seeking damages for the debtor company's alleged breach of a provision in the Stock Purchase Agreement which required the company to use its best efforts to ensure its stock was freely transferable. *Telegroup,* 281 F.3d at 135–36. The shareholders wanted to construe section 510(b) narrowly, arguing that the only claims for damages arising from a sale of securities would be claims for actionable conduct such as fraud or illegality that occurred at the time of the sale of the security. *Id.* at 135. The Third Circuit disagreed and found that a "claim for breach of a provision in a stock purchase agreement requiring the issuer to use its best efforts to register its stock and ensure that the stock is freely tradeable 'arises from' the purchase of the stock for purposes of § 510(b), and therefore must be subordinated." *Id.* at 136.

Here, it is clear that the Queens' claims relate directly to the Stock Purchase Agreement as they would not exist but for the Stock Purchase Agreement. The Queen parties argue, however, that even if their claims arise from the sale of securities, they should not be subordinated because they are not claims for "damages." (Appellant's Br. at 13.) They argue that their claim is a claim for a contractual right to payment, a "critical distinction" between *Telegroup* and this case. They ask this Court to consider them as creditors instead of shareholders by considering the right to payment included in the Stock Purchase Agreement as a promissory note or debenture. Thus, they argue, section 510(b) which is premised on requiring stockholders to accept the risk of a decline in the price of stock, does not extend to their situation because they are creditors who seek payment based on a contract.

This Court finds that the claims of the Queen parties must be subordinated pursuant to section 510(b). First, the Court agrees with Judge Burns' classification of the claim as one for "damages." As Judge Burns explained, when a party alleges that another has breached a contract, the party seeks damages for that breach. This is because damages are the measure of "monetary compensation for loss or injury to person or property." Black's Law Dictionary (7th ed.1999). Here, the Queen parties seek cash as compensation because they were not paid in accordance with a provision in a bargained-for Stock Purchase Agreement. They assert that they have been injured because they have not been paid in accordance with the provision. Characterizing their claim as one based on a contractual right to payment does not cover up the fact that their claim still seeks damages to compensate for loss suffered because they were not paid according to their contractual right.

Second, the Court finds that this claim fits well within the intended scope of section 510(b). In signing the Stock Purchase Agreement, the Queen parties were not mere creditors; they sought much more than the repayment of a fixed debt over time. They signed the Stock Purchase Agreement to trade their stock in one company for stock in another, hoping to reap the benefit of the success of the second company. They were integrally involved in determining the success of the second company. Jeffrey Queen was President of Response from January 19, 2000 until July 2000 when he became Chief Executive Officer and Andrew Queen became President. (Record on Appeal, Item 7, Ex. B, ¶ 1.) The Queens did attempt to limit their exposure to the risks of stock ownership by including section 2.6 in the Agreement. Andrew Queen, in an Affidavit, stated that in negotiating the agreement, "it was of great importance to us that we ultimately receive the purchase price in cash for the equity in Healthwatch." (Record on Appeal, Item 8, Ex. 1, ¶ 2.) Still, they agreed to receive stock instead of cash, and the possibility of making a higher return on their investment. A shareholder, who accepts the benefits of stock ownership along with the risk that the company will go bankrupt, should not be able to avoid subordination under section 510(b) by placing a risk-limiting provision in the Stock Purchase Agreement to claim creditor status in the bankruptcy proceedings. The Queen parties, pursuant to the Stock Purchase Agreement, were shareholders who retained the prospect that the securities would increase in value, sharing in the corporation's profits if it succeeded; section 510(b) precludes the Queen parties from assuming parity with creditors if the corporation fails, as *Telegroup* has held. *Telegroup*, 281 F.3d at

142. This Court, therefore, finds that section 510(b), which was intended to place the risk of insolvency on equity holders by preventing them from claiming equity in the guise of a damage claim, reaches the claims of the Queen parties.[9]

Therefore, this Court finds that Judge Burns correctly determined that the claims 47, 48, and 49 of the Queen parties fall within the ambit of section 510(b) and must be subordinated.[10] This Court will affirm the October 3, 2002 Bankruptcy Order.

## III. CONCLUSION

For the foregoing reasons, this Court will affirm the October 3, 2002 Order of United States Bankruptcy Judge Gloria M. Burns which found that proofs of claim numbers 47, 48, and 49 must be subordinated pursuant to 11 U.S.C. § 510(b).

9. This result is also supported by *In re Int'l Wireless Comm. Holdings, Inc.*, 279 B.R. 463, 468 (D.Del.2002), where the court found a claim should be subordinated when it was based on a contractual provision aimed at allowing the shareholders to recoup their purchase price should the stock price decline. The Court explained, in part that:
 > [a]ppellants were experienced businesspeople who traded their stock in one company for the stock of another. While it may be true that Appellants sought to minimize the risk they incurred by providing for addi-

tional stock disbursements and the like, they nonetheless took the risk that [the company] could go bankrupt.

10. The Court limits its holding to the facts of this case. It does not decide at this time that a stockholder can never claim the status of a creditor and escape subordination under section 510(b) in a bankruptcy proceeding. Instead, it finds that under the facts of this case, the Queen parties cannot escape subordination for claim numbers 47, 48, and 49.