v.

International Wireless Communications Holdings, Inc.; International Wireless Communications, Inc.; Radio Movil Digital Americas, Inc.; International Wireless Latin America Holdings, Ltd; Pakistan Wireless Holdings Limited

Ronald B. Frankum; Charles B. Wasaff, Appellants.

No. 02–2733.

United States Court of Appeals, Third Circuit.

Argued March 11, 2003.

Decided April 16, 2003.

In re: INTERNATIONAL WIRELESS COMMUNICATIONS HOLDINGS, INC.; International Wireless Communications, Inc.; Radio Movil Digital Americas, Inc.; International Wireless Communications Latin America Holdings, Ltd.; Pakistan Wireless Holdings, Ltd. Ronald B. Frankum; Y.F. Servern Limited; Charles R. Wasaff,

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, Wilmington, DE, Shalom L. Kohn (Argued), Sidley Austin Brown & Wood, Chicago, IL, for Appellants.

Pauline K. Morgan (Argued), M. Blake Cleary, John J. Paschetto, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for Appellees.

Before: RENDELL, AMBRO and MAGILL,* Circuit Judges.

## OPINION

AMBRO, Circuit Judge.

When persons purchase shares of stock in a corporation that files for bankruptcy, their shares come last in bankruptcy's payout priority. Conversely, creditors of the corporation come first. Similarly, when persons bring claims arising from the purchase or sale of a corporation's stock, and the corporation subsequently files for bankruptcy, those claims also are behind creditors' claims. Does this outcome change when persons who, as part of their consideration when selling a security, get shares in an entity that files for bankruptcy? The obvious answer is no. Does it make a difference that the bankrupt entity agrees prepetition to issue, if necessary, more shares or warrants to make up for any shortfall between its value at closing and later diminished value? For the Bankruptcy and District Courts, the answer again was no. We agree.

## I. Factual background and procedural history

Appellants Ronald B. Frankum and Charles R. Wasaff ("F & W") sold their shareholdings in Pakistan Mobile Communications, Ltd. ("PMCL") to International Wireless Communications Holdings, Inc. ("IWCH").[1] The consideration was $16,159,000, consisting of $10,000,000 cash and 493,510 newly issued IWCH shares. The parties expected that IWCH would conduct an initial public offering ("IPO") soon after the PMCL transaction, which would facilitate F & W's converting to cash their IWCH holdings (expected to be $6,159,000).

A Supplement to the Share Purchase Agreement (the "Supplement") set out F & W's rights with respect to the newly issued IWCH shares. Of relevance here were terms limiting F & W's risk as to the IWCH shares they accepted. The upshot was that the IPO was expected to occur within 18 months of closing. If it did, and the valuation of the IWCH shares declined, F & W would be issued additional IWCH shares to equal the $6,159,000 value assigned to the IWCH shares at closing. If an IPO did not take place within 18 months, then F & W would be entitled to either additional shares—49,351 in each year that IWCH failed to consummate the IPO—or registration rights for the 493,510 IWCH shares. If F & W elected registration rights, sold its shares in IWCH, and received less than $6,159,000, IWCH agreed to issue F & W warrants valued to make up the shortfall. Yet, were F & W able to sell their IWCH shares for more than $6,159,000, the Supplement, by nega-

---

* Honorable Frank J. Magill, United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. F & W indirectly held a minority interest in PMCL through their shares in Continental Communications Limited ("CCL"), which owned PMCL. F & W filed their claim as successor-in-interest to CCL. For convenience, we refer to F & W throughout this opinion.

tive implication, allowed them to keep the entire sale proceeds.

IWCH filed for Chapter 11 bankruptcy protection before it could conduct an IPO. F & W never requested registration of their IWCH shares. Nor did they receive any additional shares.

In Bankruptcy Court, F & W filed a proof of claim for $6,159,000. IWCH objected to this claim, arguing that it should be subordinated under 11 U.S.C. § 510(b), which states in relevant part that "[f]or the purpose of distribution [under the Bankruptcy Code], a claim arising from rescission of a purchase ... of a security of the debtor or ... for damages arising from the purchase ... of such a security ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock." The Bankruptcy Court granted IWCH's subordination motion and the District Court affirmed. F & W appeal.

## II. Jurisdiction and standard of review

The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O). The Bankruptcy Court issued a final order which was timely appealed to the District Court pursuant to 28 U.S.C. § 158(a)(1). We have jurisdiction under 28 U.S.C. § 1291. Whether a claim must be subordinated under § 510(b) is a question of law, subject to de novo review. *In re Telegroup, Inc.*, 281 F.3d 133, 136 (3d Cir.2002).

## III. Discussion

F & W seek to evade § 510(b)'s mandate. In their attempt, they contend that they did not "purchase" IWCH stock because the Share Purchase Agreement contemplated IWCH's purchase of PMCL stock, with IWCH stock merely granted to F & W as "consideration." The plain language of the Share Purchase Agreement belies this contention, as F & W agreed to receive IWCH stock. Section 101(43) of the Bankruptcy Code defines "purchaser" as a "transferee of a voluntary transfer ... [or] immediate or mediate transferee of such a transferee." This low bar easily makes F & W a purchaser of IWCH shares. *See Baldwin–United Corp. v. Adams*, 52 B.R. 539, 540 n. 1 (Bankr. S.D.Ohio 1985) (stating that stock received as consideration is purchased for § 510(b) purposes).

F & W also contend that their claim is one for damages due to IWCH's breach of its contract to deliver the remaining $6,159,000 owing under the Share Purchase Agreement, not a claim "arising from ... a purchase ... of a security of the debtor." 11 U.S.C. § 510(b). But IWCH's breach of the Share Purchase Agreement results in F & W's entitlement to more shares (or warrants for those shares) of IWCH stock. As noted above, such a transfer is still a purchase of IWCH shares.

As if we were "piling on," our Court's recent decision in *In re Telegroup, Inc.*, 281 F.3d 133 (3d Cir.2002), makes certainty about this case doubly so. There we subordinated plaintiffs' claim for damages stemming from "Telegroup's alleged breach of its agreement to use its best efforts to ensure that their stock was registered and freely tradeable." *Id.* at 135. Finding § 510(b)'s language "arising from" ambiguous, *id.* at 138, we sought guidance interpreting § 510(b) from the academic article on which Congress relied in enacting § 510(b): John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U.L.Rev. 261 (1973).

The Slain and Kripke article criticized a line of decisions in which some courts allowed shareholders equal priority with unsecured creditors when bringing securities fraud claims. The authors argued that shareholders should be deemed to

assume two risks: "(1) the risk of business insolvency from whatever cause and (2) the risk of illegality in securities issuance." *Id.* at 286. To allow shareholders to become creditors when they assert fraud claims would (improperly) give them the best of both worlds: a claim to their stock's appreciation in the upside case and creditor-like protection on the downside.

Guided by Slain and Kripke's reasoning, we concluded in *Telegroup* that § 510(b)'s application is not logically limited to securities-fraud claims. *Telegroup,* 281 F.3d at 140. Rather, all damage claims arising from the purchase of shares should be subordinated because shareholders contract to bear those risks. *Id.* at 141. Just as shareholders accept gladly the upside potential of increases in their shares' value (whatever the reason), they should also assume the risk of decline in value for whatever reason, including (but not limited to) fraud in the issuance, by having their claims subordinated—shorthand for the result that, because they purchased stock, they are at the end of the line in bankruptcy distribution priority. *Id.* at 142. Because the *Telegroup* plaintiffs' damages claim would not exist "but for" plaintiffs' stock ownership, it is subordinated. *Id.* at 143.

*Telegroup* controls our case. The Supplement's plain language indicates that any additional consideration IWCH contracted to deliver was payable (depending on the situation) either in shares or warrants (equity derivatives). Thus, F & W's claim is really one for nondelivery of an equity security—a claim "arising from . . . a purchase . . . of a security of the debtor." 11 U.S.C. § 510(b). By agreeing to receive shares or warrants as consideration for their PMCL shares, F & W agreed to bear shareholder risk. And just as shareholders bear the risk that their securities have been fraudulently issued, here too F & W must bear the risk that their shares will not be delivered according to the terms of their contract with IWCH. *Accord In re Betacom of Phoenix, Inc.,* 240 F.3d 823, 832 (9th Cir.2001) (subordinating damages for nondelivery of an equity security). Thus, because F & W's claim arises out of the purchase of IWCH's stock, § 510(b) treats it no differently from a common stock claim. 11 U.S.C. § 510(b) ("[I]f such security [for the purchase or sale of which the plaintiff seeks damages] is common stock, such claim has the same priority as common stock.").

Moreover, in this context F & W's contingent right to receive additional IWCH shares or warrants is hand in hand with its purchase of the 493,510 IWCH shares under the Share Purchase Agreement. The right to additional equity was designed to protect F & W from a decline in the value of their initial 493,510 shares and to compensate them for the risk of a delayed IPO. F & W would not have filed the proof of claim but for their purchase of the IWCH shares.[2]

\* \* \* \* \* \*

We affirm.

---

2. Finally, we note that cases such as *In re Montgomery Ward Holding Corp.,* 272 B.R. 836 (Bankr.D.Del.2001), and *In re Motels of America, Inc.,* 146 B.R. 542 (Bankr.D.Del. 1992), have no relevance here. Each refused to subordinate a former shareholder's damage claim arising from a debtor's failure to pay for a repurchase of its own stock. Once a shareholder sells his or her stock, he or she has decided not to continue assuming the downside risks or upside benefits of equity ownership. *See* Nicholas L. Georgakopoulos, *Strange Subordinations: Correcting Bankruptcy's § 510(b),* 16 Bankr.Dev. J. 91, 102 (1999). ("[P]art of Slain and Kripke's justification for subordinating fraud claims of purchases is that the purchaser assumes the risk (i.e., low seniority) associated with the security being bought. This reasoning, however, is reversed in the case of sales. The sellers of the stock no longer desire the risk and the low priority associated with the security.").